[L.A. No. 29858. In Bank. Aug. 11, 1971.]

CALIFORNIA BEER WHOLESALERS ASSOCIATION, INC., et al., Petitioners, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent;
THRIFTIMART, INC., Real Party in Interest.

[L.A. No. 29859. In Bank. Aug. 11, 1971.]

EDWARD J. KIRBY, as Director, etc., Petitioner, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent;
THRIFTIMART, INC., Real Party in Interest.

(Consolidated Cases.)

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, David W. Halpin, Deputy Attorney General, and Albert G. Evans for Petitioners.

Leo K. Gallant for Respondent.

Steck & Marston and Emil Steck, Jr., for Real Party in Interest.

## OPINION

**TOBRINER, J.**—In these consolidated cases petitioners seek review of an order by the Alcoholic Beverage Control Appeals Board granting a wholesale beer and wine license to a retailer of alcoholic beverages. We decide here that section 25502 of the Business and Professions Code, which forbids a beer and wine wholesaler from holding an off-sale retail license, necessarily prohibits the holder of an off-sale retail license from obtaining a beer and wine wholesale license. Once the retailer of alcoholic beverages acquires a wholesale beer and wine license, that retailer automatically "holds" the wholesale license; he is accordingly a beer and wine wholesaler "holding" a retail liquor license, and this integration of licenses is specifically forbidden by section 25502. To rule otherwise would be to create the anomalous situation that the right to hold both licenses would depend upon the fortuity of the order in which a party applied for them. But the error of such an incongruous result would go deeper; it would violate the legislative design of segregating wholesale from retail interests; it would permit, rather than prevent, the merging of the marketing functions and powers that the Legislature meant to keep separate.

### 1. *The facts.*

Thriftimart, Inc. (real party in interest) is a corporation consisting of two divisions managed and controlled by the same officers and board of directors. The retail division, Thriftimart, operates 77 retail grocery store outlets. Thriftimart, Inc., holds 73 off-sale general licenses authorizing the sale of packaged alcoholic beverages at 73 of these 77 retail outlets.[1] The wholesale division, Smart and Final Iris Company, operates a wholesale grocery warehouse and 85 cash and carry wholesale grocery outlets serving primarily institutional buyers and small retail grocers.

In early 1969, Thriftimart, Inc., applied for a beer and wine wholesaler's license for its wholesale division, Smart and Final Iris Company. California

---

[1]An off-sale general license permits the holder to sell packaged beer, wine, and distilled spirits for consumption off the premises where sold. (Bus. & Prof. Code, § § 23393, 23394.) All references not otherwise designated are to the Business and Professions Code.

Beer Wholesalers Association, Inc., Pasadena Beverage Company, and California Retail Liquor Dealers Institute, filed protests against Thriftimart's application.

On August 18, 1969, the Department of Alcoholic Beverage Control (hereinafter department) conducted a hearing on the application of Thriftimart, Inc. At the conclusion of the proceeding the hearing officer sustained the protests, recommending that the license application be denied. The hearing officer concluded that although Thriftimart, Inc., did not intend to purchase beer and wine from its wholesale division for resale by its own retail division in violation of Business and Professions Code section 23779,[2] nevertheless a single firm could not hold both an off-sale retail license and a wholesale liquor license.

On November 7, 1969, the department adopted the hearing officer's proposed decision, stating, "If Thriftimart, Inc., obtained a beer and wine wholesaler's license it would be a wholesaler holding the ownership directly of 73 off-sale general licenses . . . . The granting of the petition would create a tied house relationship in violation of section 25502 of the Business and Professions Code . . .[3] [and] . . . would be contrary to the public welfare and morals."

---

[2]The hearing officer's conclusion in effect constituted a finding that Thriftimart, Inc., if granted the license, would not violate section 23779. Section 23779 provides in relevant part: "No wholesale license shall be issued to any person who does not in good faith actually carry on or intend to carry on a bona fide wholesale business by sale to retail licensees of the alcoholic beverage designated in the wholesale license. . . . Sale by a wholesale licensee to himself as a retail licensee is not the transaction of a bona fide wholesale business."

[3]Section 25502 provides: "No manufacturer, winegrower, manufacturer's agent, rectifier, distiller, bottler, importer, or wholesaler, or any officer, director or agent of any such person, shall, except as authorized by this division:

"(a) Hold the ownership, directly or indirectly of any interest in an off-sale general license.

"(b) Furnish, give, or lend any money or other thing of value, directly or indirectly, to, or guarantee the repayment of any loan or the fulfillment of any financial obligation of, any person engaged in operating, owning, or maintaining any off-sale general licensed premises.

"(c) Own or control any interest, directly or indirectly, by stock ownership, interlocking directors, or trusteeship, in the business, furniture, fixtures, refrigeration equipment, signs, except signs for interior use mentioned in subdivision (g) of Section 25503, or lease in premises licensed with an off-sale general license.

"(d) Own or control any interest, directly or indirectly, by stock ownership, interlocking directors, trusteeship, or mortgage of the realty upon which an off-sale general licensed premises is maintained.

"Any wholesaler in counties not to exceed 15,000 population who holds both a beer and wine wholesaler's license and an off-sale general license and who held such licenses prior to September 19, 1947, may continue to hold such licenses or may

Thriftimart, Inc., appealed the department's decision to the Alcoholic Beverage Control Appeals Board (hereinafter board). The board reversed the department upon the ground that section 25502 "has no application to the facts here presented since that statute relates to an entirely different set of circumstances." The board reasoned: "To permit appellant the actual bona fide use of the wholesaler's license would not constitute a wrong or a violation of any statutory prohibition. . . . In this respect the instant case is readily distinguishable from *Louis Stores* and *Borun Brothers*.[4] . . . Thriftimart stores will not purchase beer and wine from its wholesale division. . . . We agree with appellant that the question here presented should be resolved by applying section 25506[5] to the issue raised by the application for a wholesaler's beer and wine license."

The board then proceeded to interpret sections 25502 and 25506 in the following manner: Section 25502 provides that no *wholesaler of beer, wine, or distilled spirits*[6] shall hold any interest in a retailer's off-sale liquor license. Section 25506 provides that no holder of a *retailer's* off-sale license shall possess any interest in a firm holding a *distilled spirits* wholesaler's license. By forbidding a retailer from holding only a distilled spirits wholesaler's license, section 25506 might be construed under the doctrine of *inclusio unius est exclusio alterius* to suggest that a retailer is free to acquire a wholesaler's beer and wine license.

---

transfer either or both licenses to another individual, individuals, partnership, corporation or other legal entity. Where both licenses are simultaneously transferred to an individual, individuals, partnership, corporation or other legal entity, the transfer shall be a person-to-person transfer only.

"Nothing in this section prohibits any holder of a distilled spirits manufacturer's, manufacturer's agent's, rectifier's, or wholesaler's license, or any officer, employee, or representative of any such licensee, from acting as a trustee for any off-sale general licensee in any bankruptcy or other proceedings for the benefit of the creditors of the off-sale general licensee.

"Nothing in this section shall alter, change, or otherwise affect, retroactively or prospectively, any of the rights or privileges granted to a winegrower or brandy manufacturer by Section 23362 of this code, or by any other provision of this division."

[4]The board here has reference to *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749 [22 Cal.Rptr. 14, 371 P.2d 758], and *Borun Brothers* v. *Department of Alcoholic Beverage Control* (1963) 215 Cal.App.2d 503 [30 Cal.Rptr. 175].

[5]Section 25506 provides: "Except as authorized by this division, no off-sale general licensee, or any officer, director, employee, or agent of such licensee, shall hold any ownership or interest, directly or indirectly, in the business, property, or license of any distilled spirits wholesaler, rectifier, distilled spirits manufacturer, or distilled spirits manufacturer's agent."

[6]Section 25502 actually states that no "wholesaler" shall hold any interest in an off-sale general license. Section 23021, however, defines "wholesaler" as any merchant dealing in alcoholic beverages at the wholesale level. Section 23004 defines alcoholic beverages to include wine, beer, and distilled spirits.

## 2. *The historical development of the tied-house restriction.*

In order to understand the relationship of sections 25502 and 25506, we must examine the origins of these two sections in particular, and the legislative background of the California Alcoholic Beverage Control Law in general.

Following repeal of the Eighteenth Amendment, the vast majority of states, including California, enacted alcoholic beverage control laws. These statutes sought to forestall the generation of such evils and excesses as intemperance and disorderly marketing conditions that had plagued the public and the alcoholic beverage industry prior to prohibition. (See United States Department of Commerce, State Liquor Legislation (1941) at p. 20; *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 360 [55 Cal.Rptr. 23, 420 P.2d 735]; *Neel* v. *Texas Liquor Control Board* (Tex.Civ.App. 1953) 259 S.W.2d 312, 316-317; Bus. & Prof. Code, § 23001.) By enacting prohibitions against "tied-house" arrangements, state legislatures aimed to prevent two particular dangers: the ability and potentiality of large firms to dominate local markets through vertical and horizontal integration (see *Neel* v. *Texas Liquor Control Board, supra,* 259 S.W.2d 312) and the excessive sales of alcoholic beverages produced by the overly aggressive marketing techniques of larger alcoholic beverage concerns (see *Allied Properties* v. *Dept. of Alcoholic Beverage Control* (1959) 53 Cal.2d 141 [346 P.2d 737]; *Affiliated Distillers Brands Corp.* v. *Sills* (1970) 56 N.J. 251 [265 A.2d 809]).[7]

The principal method utilized by state legislatures to avoid these anti-social developments was the establishment of a triple-tiered distribution and licensing scheme. (See *Affiliated Distillers Brands Corp.* v. *Sills, supra,* 56 N.J. 251; *Downer* v. *Liquor Control Commission* (1948) 134 Conn. 555 [59 A.2d 290].) Manufacturing interests were to be separated from wholesale interests; wholesale interests were to be segregated from retail interests. In short, business endeavors engaged in the production, handling, and final sale of alcoholic beverages were to be kept "distinct and apart." (25 Ops.Cal.Atty.Gen. 288, 289 (1955).)

In the era when most tied-house statutes were enacted, state legislatures confronted an inability on the part of small retailers to cope with pressures

---

[7]"Underlying the tied-house prohibition is the assumption that the retail market for alcoholic beverages is elastic and that price cutting, aggressive marketing techniques, and similar practices tend to increase consumption and threaten the legislative goal of temperance." (*Affiliated Distillers Brands Corp.* v. *Sills, supra,* 265 A.2d at p. 813.) For similar statements see *State* v. *Zazzaro* (1941) 128 Conn. 160 [20 A.2d 737]; *James J. Sullivan, Inc.* v. *Cann's Cabins, Inc.* (1941) 309 Mass. 519 [36 N.E.2d 371, 136 A.L.R. 1236]; *Sepe* v. *Daneker* (1949) 76 R.I. 160 [68 A.2d 101].)

exerted by larger manufacturing or wholesale interests.[8] (See *Pickerill* v. *Schott* (Fla. 1951) 55 So.2d 716, 718; *Weisberg* v. *Taylor* (1951) 409 Ill. 384, 390 [100 N.E.2d 748] see also 32 Ops.Cal.Atty.Gen. 75, 76 (1958); 48 C.J.S., § 197, at p. 329.) Consequently, most of the statutes enacted during this period (1930-1940) manifested a legislative policy of controlling large wholesalers; the statutes were drafted in sufficiently broad terms, moreover, to insure the accomplishment of the primary objective of the establishment of a triple-tiered system. All levels of the alcoholic beverage industry were to remain segregated; firms operating at one level of distribution were to remain free from involvement in, or influence over, any other level. Thus, although the most significant development in the industry since the 1950's has been the growth of large retail chains, the alcoholic beverage statutes enacted in the 1950's are sufficiently broad to control industry-wide domination by large retail chains as well.[9]

In addition, most statutes placed more stringent requirements on interests dealing in distilled spirits than on those dealing exclusively in beer and wine. Legislatures were especially concerned with the prevention of intemperance in the consumption of distilled spirits, since distilled spirits, of course, contain a significantly higher alcoholic content than beer and wine. Further, since distilled spirits may not deteriorate as rapidly as some beer and wine, legislatures were particularly fearful of the possibility that wholesalers of distilled spirits would foist even greater inventories upon local retailers. (Cf. *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 186, fn. 1 [70 Cal.Rptr. 407, 444 P.2d 79] (dissenting opn. of Burke, J.).)

With this historical background in mind, we turn to an examination of the particular California statutes at issue in this case.

3. *The statutory implementation of the tied-house restriction.*

California's alcoholic beverage control laws and tied-house provisions[10] effectuate the legislative objectives outlined above. See section 23001. In

[8]The purpose of tied-house prohibitions was "to prevent the integration of retail and wholesale outlets and to remove retail dealer in intoxicating liquors from financial or business obligations to the wholesaler, with the exception of ordinary commercial credit for liquors sold." (*Pickerill* v. *Schott* (Fla. 1951) 55 So.2d 716, 718 (quoting from 48 C.J.S., § 197, at p. 329).) "[T]he prohibition . . . exists primarily to remove the influence by the manufacturer over the wholesaler and the wholesaler over the retailer, a practice which might result in preference for the manufacturer's or wholesaler's product. . . ." 32 Ops.Cal.Atty.Gen. 75, 76 (1958).

[9]See 27 U.S.C. § 205, subds. (a), (b); Fla. Stat. Ann., § 561.42; Kan. Stat. Ann. ch. 41, art. 7, § 704; 2 Ky. Rev. Stat., § 243.110; N.J. Stat. Ann. 33: 1-43; 93.6 et seq.; 10 A Tenn. Code Ann., § 57-140; 21 Wis. Stat. Ann., § 176.05(5a).

[10]See sections 25500-25510.

*Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1964) 61 Cal.2d 305 [38 Cal. Rptr. 409, 392 P.2d 1], we noted that the California Legislature had "inferentially declared that the public policy is best served if all persons engaged in the handling of alcoholic beverages, whether manufacturing, wholesaling, importing or retailing be kept distinct and apart . . . . Among the purposes of such prohibitions is the prevention of integration of wholesale and retail outlets, and the imposition of quotas on retailers." (61 Cal.2d at p. 309.) Similarly, the California Legislature drafted its tied-house restrictions in a manner that foresaw the growth of large retail concerns such as Thriftimart, Inc.[11]

The Legislature first enacted section 25502 of the Business and Professions Code as section 54(f) of the Alcoholic Beverage Control Act of 1937, designing it to establish a triple-tiered licensing scheme for California. ▮ In its present form, section 25502 prohibits any substantial integration between commercial interests holding wholesale beer and wine or distilled spirits licenses and interests holding general off-sale retail liquor licenses. This legislative bar to a consolidated operation was not conditioned upon the means by which such a consolidation might be accomplished. Rather, it was to be operative regardless of whether the impetus for the integration came from the wholesaler's or the retailer's side; it was the end result, rather than the method of its attainment, that the Legislature exorcised.

We recognize that the Legislature carved out some exceptions to this blanket prohibition.[12] For example, section 25502 exempts all businesses which held both wholesale and retail licenses prior to 1947 and are located in counties with less than 15,000 population. Section 25508 exempts certified cooperatives, allowing them to admit both wholesale and retail

---

[11]Cf. *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 178 [70 Cal.Rptr. 407, 444 P.2d 79]; *Blatz Brewing Co.* v. *Collins* (1945) 69 Cal.App.2d 639 [160 P.2d 37]; section 25505.

[12]Thriftimart, Inc., asserts that the provision for several exceptions to section 25502 renders the entire licensing scheme unconstitutional. We have consistently recognized, however, that the state may exercise particularly wide powers with respect to the manufacture and distribution of alcoholic beverages and may provide, prohibit, or restrict sales and distribution, as it may deem proper. (See *Allied Properties* v. *Dept. of Alcoholic Beverage Control, supra,* 53 Cal.2d 141, 147; cf. *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control, supra,* 65 Cal.2d 349.) "The legislature is not bound, in order to adopt a constitutionally valid statute, to extend it to all cases which might possibly be reached, but is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be the most evident." (*Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 833 [48 Cal. Rptr. 481, 409 P.2d 481]; see *Railway Express Agency* v. *New York* (1949) 336 U.S. 106 [93 L.Ed. 533, 69 S.Ct. 463].)

licensees to their membership rolls.[13] We note first, however, that if it were generally permissible for the same party to hold both a beer and wine wholesaler's license and an off-sale retail license, these specific authorizations would be unnecessary. Second, even these few exceptions are severely narrowed by the restriction contained in section 23779.[14] Section 23779 prohibits a licensee's wholesale department from dealing exclusively with its retail department: "Sale by a wholesale licensee to himself as a retail licensee is not the transaction of a bona fide wholesale business."

Contrary to the board's assertion, section 25502 and section 25506 are neither inherently nor fundamentally in conflict. As it stood at the time of the application of Thriftimart, Inc.—prior to its amendment in November 1969—section 25502 prohibited, in general terms, integration between wholesale and retail interests dealing in alcoholic beverages.[15] Section 25506, on the other hand, placed more stringent and particular restraints upon those interests dealing in distilled spirits. Thus, although section 25502 prohibited a general wholesaler of beer, wine, or distilled spirits from owning an interest in the *license* or *premises* of an off-sale retailer, section 25506 prohibited an off-sale retailer from having any interest in the *business, property, or license of a distilled spirits wholesaler.* In other words, the Legislature framed the ban that forbade the retailer from holding an interest in a distilled spirits wholesaler in much stronger and more formidable terms than the direct prohibition against the retailer's ownership of an interest in the license or premises of a wholesaler. Section 25506 therefore was not drawn to *limit* in any way the more general policy of segregation announced in section 25502. That the Legislature later amended and expanded the prohibitions of section 25502 to correlate them with section 25506 does not serve to impair the legislative design or to diminish the effect of the ban of section 25502.

We therefore reject the contention that because section 25506 does not specifically *prohibit* a retailer from possessing an interest in a

[13]Section 25508 provides in relevant part: "Any person who held an interest in, or was a member of, a cooperative wholesale grocery company on May 1, 1947, which cooperative holds a distilled spirits wholesaler's license, may hold and renew his off-sale general license and may acquire an off-sale general license or licenses for bona fide retail grocery store or stores. . . ."

[14]See footnote 2, *supra.*

[15]Section 25502 as it stood in 1969 provided in relevant part that "No manufacturer, wine grower, manufacturer's agent, rectifier, distiller, bottler, importer, or wholesaler, or any officer, director, or agent of any such person, shall, except as authorized by this division, hold the ownership, directly or indirectly, of any off-sale general *license* for any premises, or own or control any interest, directly or indirectly, by stock ownership, interlocking directors, trusteeship, or mortgage *of the premises* or fixtures covered by an off-sale general license. . . ." (Italics added.)

beer and wine wholesale license, it creates an inference that it *permits* a retailer to possess an interest in such a license. To argue that section 25506 should be interpreted to sanction such dual licensing because the section does not *specifically* prohibit the retail off-sale licensee from holding a wholesale beer and wine license is to overlook the legislative prohibition of such consolidation of licenses in section 25502. The Legislature was not required to *repeat* that prohibition in section 25506. Further, as we have noted, the attempt to use section 25506 to nullify the general prohibition of section 25502 would also nullify the Legislature's basic objective of erecting a triple-tiered system of distribution and licensing and would thereby weaken the entire framework of the statutory structure.

Our interpretation of section 25502 finds support in the only California case which has dealt with a factual situation similar to that presented by the instant application: *Borun Bros.* v. *Department Alcoholic Beverage Control* (1963) 215 Cal.App.2d 503 [30 Cal.Rptr. 175]. In that case, Borun Brothers, a corporation, held a beer and wine wholesaler's license. Thrifty Drug Stores, Borun Brothers' *alter ego,* owned an off-sale general retailer's license. Both corporations were controlled by essentially the same executives and board of directors. When California Beer Wholesalers Association filed an accusation with the Department of Alcoholic Beverage Control, alleging that Borun Brothers was in violation of section 25502 and section 23779, the department revoked Borun Brothers' wholesale beer and wine license. The board affirmed, finding Borun Brothers in violation of sections 25502 and 23779[16] *"severally and separately."* (215 Cal. App.2d at p. 509.)

In upholding the board's decision, the Court of Appeal adopted almost verbatim the board's reasoning. The court did not concern itself with whether the Borun-Thrifty conglomerate was primarily a retailer or wholesaler. Rather, it held that Borun Brothers was in violation of section 25502 regardless of whether it was a retailer holding a beer and wine wholesaler's license or a beer and wine wholesaler holding a general off-sale retailer's license.

The board's decision in the instant case seeks to distinguish *Borun Brothers* on the ground that the court found *Borun Brothers* had violated section 23779, and that this violation differentiates the cases. A close examination of *Borun Brothers,* however, reveals that the Court of Appeal rested its affirmance of the revocation of Borun Brothers' license on either of the two grounds—a violation of section 23779 *or* a violation of section

---

[16]The appeals board noted that during the period 1953-1958 Borun Brothers had made no sales of beer and wine to anyone other than Thrifty Drug Stores.

25502. The fact that the present case does not involve a violation of section 23779 does not erect a difference in substance from *Borun Brothers*. The grant of a wholesaler's license to Thriftimart, Inc., would entail the same undesirable consequences that would have attended the *Borun Brothers* situation; the dual licensing would necessarily impose a serious administrative burden upon the department. Periodically, it would be required to peruse that firm's accounts in order to insure that violations of section 23779 did not develop or go undetected and that the firm did not use profits realized by its wholesale division to finance unfair competitive activities on the part of its retail division.

We conclude that if we were to adopt the board's method of reconciling section 25502 and section 25506, we would create a paradox in which a firm's ability to hold both licenses would depend upon the *sequence* in which it applied for the wholesale and retail licenses. If we were to allow Thriftimart, Inc., as a *retailer* to obtain a wholesaler's license, we would face the anomalous situation that when Thriftimart, Inc., applies for its 74th off-sale retail license, it, as a *wholesaler,* unquestionably would be prohibited by section 25502 from obtaining an additional retail license. Thus a firm that obtained a beer and wine wholesaler's license prior to a retailer's license would be barred from securing a retailer's license; yet a firm ingenious enough to have first obtained an antecedent retailer's license would thereafter be absolutely free to procure a wholesaler's license. Surely the Legislature could not have intended to enact a licensing scheme so easily and ridiculously circumvented. ■ The fortuity of the acquisition of a retail license before a wholesale license cannot logically or sensibly determine the right of a licensee to hold both licenses.

The decision of the Alcoholic Beverage Control Appeals Board is annulled; the cause is remanded for proceedings consistent with the views expressed herein.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., and Kaus, J.,* concurred.

**PETERS, J.**—I dissent.

The majority in construing the statutes before us are telling us what the Legislature should have done rather than what it did, and are thus violating the cardinal principle that our job begins and ends with determining the legislative intent. The meaning of the statutes when placed side by side is clear, and since they are closely related both as to subject matter and

---

*Assigned by the Chairman of the Judicial Council.

numerical placement, they must be interpreted together. When interpreted together it is clear that a retailer may acquire a beer and wine wholesaler's license, although the wholesaler would not be permitted to acquire a retailer's license. As we shall see, there is a substantial justification for the distinction made by the Legislature. The Alcoholic Beverage Control Appeals Board recognized that its function was to determine what the Legislature had done and did not consider whether the statutes should or should not be extended beyond their apparent meaning. We should affirm the order of the board.

The majority seek to avoid the clear meaning of the statutes by a resort to the history of legislative opposition to vertical integration or tied-house relationships in the alcoholic beverage industry and by a claim that it would be paradoxical to accept the clear meaning of the statutes. However, although there is a history of opposition to vertical integration, the Legislature has made exceptions to its opposition, and there is no reason not to give effect to the exception involved here as well as the other exceptions.

The statutory pattern shows careful consideration of the various evils and benefits of vertical integration, and contrary to the majority's view, the carefully drawn legislative scheme should not be invalidated by condemning all vertical integration. When the problems involved in vertical integration are scrutinized it is apparent that there is a sound policy reason for prohibiting a wholesaler from having a chance of becoming a retailer which does not exist in the instant case where a retailer seeks to enter the wholesale business. Thus, there is no paradox in adopting, as the Legislature did, different rules for the two situations.

Secondly, the majority in relying on their claimed paradox fail to mention the greater paradox which continues to exist even in the light of their construction of the statutes. As the appeals board points out, no statute prohibits a beer and wine wholesaler from acquiring a beer and wine off-sale retailer's license or a beer and wine off-sale retailer from acquiring a beer and wine wholesaler's license. The Attorney General concedes that persons may own off-sale beer and wine licenses and wholesale beer and wine licenses at the same time. In other words, tied houses and vertical integration are permitted in beer and wines. (The sections basically involved here relate to off-sale *general* licenses.)

Thirdly, if the issue of paradox is relevant, the ultimate paradox is the immediate and direct practical effect of the majority opinion and its reasoning. In the name of opposition to vertical integration, the majority prohibit Thriftimart, Inc., which does not intend to integrate a retail and wholesale business, from obtaining a wholesale license which Thriftimart

wants so that it can compete against a grocery cooperative, which is vertically integrated.

Section 25502 of the Business and Professions Code provides: "No . . . wholesaler . . . shall, except as authorized by this division: (a) Hold the ownership, directly or indirectly, of any interest in an off-sale general license. . . ." Section 25506 of that code provides: "Except as authorized by this division, no off-sale general licensee . . . shall hold any ownership or interest, directly or indirectly, in the business, property, or license of any *distilled spirits wholesaler,* . . ." (Italics added.) The only reasonable interpretation of the sections when they are analyzed together is that section 25506 is a limitation on the business in which an off-sale general licensee (retailer) may engage in and section 25502 is a limitation on the business a wholesaler may engage in. It follows that although any wholesaler is prohibited from acquiring any interest in a retailer, a retailer is prohibited only from acquiring an interest in a "distilled spirits wholesaler," and there is no prohibition against a retailer acquiring an interest in a beer and wine wholesaler.

If there were any doubt as to this construction of the code sections, it is dispelled by the parallel provisions of sections 25500 and 25505 of the Business and Professions Code dealing with the relationship insofar as relevant here between wholesalers and *on*-sale licensees. Section 25500 like section 25502 must be read as a restriction on wholesalers, and section 25505 like section 25506 must be read as a restriction on retailers. Any other construction would render section 25505 meaningless. Section 25500 provides: "No . . . wholesaler . . . shall: (a) Hold the ownership, directly or indirectly, of any interest in any on-sale license. . . . (c) Own any interest, directly or indirectly, in the business, furniture, fixtures . . . lease . . . or . . . in realty acquired after June 13, 1935, upon which on-sale premises are maintained. . . ." Section 25505 provides: "No on-sale licensee . . . shall hold any ·ownership or interest, directly or indirectly, in any . . . wholesaler's license, the business conducted under such license, or the property used in the business. . . ."

The majority urge that section 25502 means not only that a wholesaler may not acquire a retail license but also that a retailer may not acquire a wholesale license. Such a construction renders section 25506 meaningless in violation of the familiar rule of statutory construction. The majority attempt to avoid the violation by urging that its construction, if applied to the sections prior to the 1969 amendment to section 25502, would give some meaning to section 25506. First, the meaning is a very limited one and leaves the provisions of section 25506 largely duplicative of those in

section 25502. Second, the argument fails because it means that the Legislature in 1969 did not realize that it was then rendering section 25506 meaningless, contrary to the rule of statutory construction. Third, the argument will not work as to the parallel provisions of sections 25500 and 25505 quoted above because those provisions were not changed as to relevant matters in 1969.

The majority also state that the exemptions for cooperatives and for small counties would be unnecessary if the same party could hold both a beer and wine wholesaler's license and an off-sale retail license. But this is erroneous because the exemptions would still be necessary if the cooperative or the person in the small county held a distilled spirits wholesaler's license. Moreover, the cooperative exemption in section 25508 by its own terms can have no application to the situation before us. The section applies only to cooperatives which have "a distilled spirits wholesaler's license." The section has no application to beer and wine wholesale licenses, the matter before us.

I do not find it unreasonable for the Legislature to apply different rules when a beer and wine wholesaler is seeking a retailer's license than when a retailer is seeking to obtain a beer and wine wholesaler's license. In *Harris v. Alcoholic Bev. etc. Appeals Bd.*, 61 Cal.2d 305, 309 [38 Cal.Rptr. 409, 392 P.2d 1], we mentioned two purposes for the prohibitions of tied-house agreements, identifying one as the prevention of "imposition of quotas on retailers." It seems clear to me that if wholesalers are in a position to obtain a retail license they may, by threatening to open a nearby competing retail establishment, compel a retailer to meet a quota. But permitting a retailer to obtain a wholesale license does not involve any such danger.

Vertical integration may, of course, involve other evils than the one discussed in the preceding paragraph. On the other hand, vertical integration may in some situations involve benefits to the consumer. It is for the Legislature to weigh the benefits and detriments in each situation and determine whether vertical integration should be prohibited. The fact that the Legislature has seen fit to prohibit vertical integration in a large number of situations in the alcoholic beverage industry based on its assessment of the relative benefits and evils does not warrant a conclusion that it intended to prohibit such integration in all situations.

Similarly, once we recognize that there are different evils involved in permitting a retailer to become a wholesaler than in permitting a wholesaler to become a retailer, we cannot say that it is anomalous or paradoxi-

cal for the Legislature to have adopted different rules for the different situations. We should give effect to the legislative intent as manifested by the statutory provisions; it is not for us to attempt to reweigh the benefits and evils and substitute our judgment for that of the Legislature. Nor should we assume in the light of the detailed statutory pattern that the Legislature was not aware of the meaning of its statutes. And we should not attempt to extend them beyond their provisions on the basis of a general opposition to vertical integration in the alcoholic beverage industry when it is apparent that the Legislature has made a number of exceptions to its opposition.

The majority also rely upon *Borun Bros.* v. *Department Alcoholic Beverage Control,* 215 Cal.App.2d 503 [30 Cal.Rptr. 175]. The case, however, never considered or mentioned the provisions of section 25506, and thus should not be considered substantial authority for determining the construction of the statutes before us.

Since the majority have placed so much emphasis on the claimed paradox, I would be remiss if I did not call attention to the paradox shown by the practical effect of the majority ruling to the party before it. As the majority recognize, Thriftimart operates both 77 retail grocery store outlets and a wholesale division which serves institutional buyers and independent retail grocers. The majority also point out that the hearing officer concluded that Thriftimart did not intend to purchase beer and wine from its wholesale division for resale by its own retail division, but the majority fail to point out the effect of this finding. The evidence is that Thriftimart wants the wholesale license to sell to its institutional buyers and independent grocers so it can compete with its chief competitor in the wholesale business, Certified Grocers, a cooperative wholesale grocery company which has a wholesale beer and wine license and sells to its retail grocery members, most of whom have off-sale general licenses. Or, in other words, the evidence clearly shows that Thriftimart wants to give the independent retailers who purchase from its wholesale division the same competitive advantage they would have if they purchased from Certified Grocers. The evidence shows that the small retail grocers will be denied substantial savings if they are unable to purchase beer from their wholesale grocery outlets. The evidence also shows that Thriftimart's retail stores, which apparently are large outlets, are already obtaining these savings by purchasing from other wholesalers and that beer makes up 4 percent of the wholesale grocery business, obviously a significant part.[1]

---

[1] The gist of this evidence is that the small retail grocery store cannot obtain from beer wholesalers not in the grocery business private label beer at the savings that large

In sum, Thriftimart does not seek any vertical integration. Its chief competitor is vertically integrated. It seems paradoxical to me to deny Thriftimart a wholesale license in the name of opposition to vertical integration when its chief competitor in the field is permitted to carry on a vertically integrated business.

I would interpret the statutes together, would not extend them beyond their plain meaning, and would affirm the order of the Alcoholic Beverage Control Appeals Board.

The petition of the real party in interest for a rehearing was denied September 8, 1971. Burke, J., did not participate therein. Peters, J., was of the opinion that the petition should be granted.

---

retailers receive. But the small retailers could obtain those savings if they could purchase from their wholesale grocer.