TRAFFIC JAM & SNUG, INC v LIQUOR CONTROL COMMISSION

Docket No. 121491. Submitted March 11, 1992, at Detroit. Decided July 6, 1992, at 9:55 A.M.

Traffic Jam & Snug, Inc., Dylan Enterprises, Inc., and Ben Edwards petitioned the Liquor Control Commission for a ruling whether the petitioners were prohibited by statute from being licensed as a brewer. Traffic Jam operates a restaurant and holds class C and specially designated merchant liquor licenses. Dylan Enterprises owns the realty where the restaurant is located and both are solely owned by Ben Edwards. Edwards desired to create a corporation that would be a wholly owned subsidiary of Traffic Jam, license the subsidiary as a brewer, operate the brewery on the restaurant premises, and then have the subsidiary sell its product to Traffic Jam and other retail licensees. The commission found that it was prohibited by statute from licensing the proposed subsidiary corporation as a brewer. The petitioners appealed, and the Wayne Circuit Court, J. Phillip Jourdan, J., affirmed. The petitioners appealed by leave granted.

The Court of Appeals *held:*

The Liquor Control Commission and the trial court correctly found that MCL 436.31; MSA 18.1002, which prohibits a corporate retail liquor licensee from owning a subsidiary corporation licensed as a manufacturer or brewer, barred the proposed arrangement and, hence, that the commission was without authority to license the proposed subsidiary corporation as a brewer.

Affirmed.

INTOXICATING LIQUORS — LICENSES — RETAIL LICENSEES — BREWERS.

The Liquor Control Act prohibits a corporate retail liquor licensee from owning a subsidiary corporation licensed as a manufacturer of any alcoholic liquor; included within the definition of "manufacturer" are distillers, rectifiers, wine makers, and brewers (MCL 436.2j, 436.31; MSA 18.972[10], 18.1002).

REFERENCES

Am Jur 2d, Intoxicating Liquors §§ 114 *et seq.*

See the Index to Annotations under Intoxicating Liquors.

*Thomas M. Burns, Jr.,* for the petitioners.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Arthur E. D'Hondt* and *Thomas J. Giachino,* Assistant Attorneys General, for the respondent.

Before: MacKenzie, P.J., and Wahls and Brennan, JJ.

Wahls, J. Petitioners appeal by leave granted from an order of the Wayne Circuit Court that upheld a declaratory ruling of the Liquor Control Commission (LCC). The LCC had found that it was prohibited by statute from licensing as a brewer a corporation that is a wholly owned subsidiary of a retail licensee. We agree and affirm.

Petitioner Traffic Jam & Snug, Inc., operates a restaurant, bakery, and cheese factory and holds class C and specially designated merchant liquor licenses. Petitioner Dylan Enterprises, Inc., owns the realty where Traffic Jam is located, and both Traffic Jam and Dylan Enterprises are solely owned by petitioner Ben Edwards. Edwards desired to add a "mini-brewery" to Traffic Jam for the purpose of brewing and selling beer to Traffic Jam patrons for consumption on and off the premises. Such an arrangement is commonly known as a "brewpub," i.e., a restaurant or bar that produces one or more types of beer on its premises, frequently in an area where patrons can observe the brewing process. Edwards intended to create a corporation that would be a wholly owned subsidiary of Traffic Jam & Snug, Inc., license the subsidiary as a brewer, and then have the subsidiary sell its product to Traffic Jam and other retail licens-

ees.[1] Edwards sought a declaratory ruling from the LCC, framing the issue as follows:

> Acknowledging that MCL 436.31 [MSA 18.1002] prohibits a manufacturer from having any interest in any other vendor, does MCL 436.31 [MSA 18.1002] prohibit a corporate retail licensee from owning a subsidiary corporation licensed as a manufacturer (brewer)?

The LCC found that MCL 436.31; MSA 18.1002 barred petitioners' proposed arrangement and, hence, the LCC was without authority to license the proposed subsidiary corporation as a brewer. Petitioners appealed to the circuit court, which ruled in favor of the LCC's interpretation of § 31. This appeal followed. Although we recognize that several valid arguments are made by petitioners in opposition to the LCC's determination, we believe that they must fail in light of the Legislature's intent in enacting the Liquor Control Act, MCL 436.1 *et seq.*; MSA 18.971 *et seq.*, an intent that is overwhelmingly manifested in the act.

The Liquor Control Act imposes several bars to the creation of "tied-house" systems of alcoholic beverage production, distribution, and sale.

> "Tied house" statutes are aimed at preventing the integration of manufacturing, wholesale, warehouse, and retail outlets in the liquor industry. . . . It has been a fear . . . that economic power at one level in this four-tiered system (manufacturers, warehouses, wholesalers, and retailers) could be transferred to another level in order to gain control at the second level. [*Borman's, Inc v Liquor Control Comm,* 37 Mich App 738, 746; 195 NW2d 316 (1972).]

---

[1] Petitioners did not intend to have the subsidiary corporation sell beer directly to consumers on the premises of Traffic Jam and the brewery. See OAG, 1985-1986, No 6397, p 397 (October 27, 1986).

Section 31 proscribes several types of business arrangements that tend to foster vertical integration. Expressions of the Legislature's intent to prevent vertical integration in the state's liquor industry, and a few narrow exceptions for certain situations, may also be found elsewhere in the Liquor Control Act.[2] Section 31 provides, in part:

(1) Except as provided in section 31a, a manufacturer, mixed spirit drink manufacturer, warehouseman, wholesaler, outstate seller of beer, outstate seller of wine, outstate seller of mixed spirit drink, or vendor of spirits shall not have any financial interest, directly or indirectly, in the establishment, maintenance, operation, or promotion of the business of any other vendor.

(2) Except as provided in section 31a, a manufacturer, mixed spirit drink manufacturer, warehouseman, wholesaler, outstate seller of beer, outstate seller of wine, outstate seller of mixed spirit drink, or vendor of spirits or a stockholder of a manufacturer, mixed spirit drink manufacturer, warehouseman, wholesaler, outstate seller of beer, outstate seller of wine, outstate seller of mixed spirit drink, or vendor of spirits shall not have an interest by ownership in fee, leasehold, mortgage, or otherwise, directly or indirectly, in the establishment, maintenance, operation, or promotion of the business of any other vendor.

(3) Except as provided in section 31a, a manufacturer, mixed spirit drink manufacturer, ware-

_____

[2] See, e.g., MCL 436.19d; MSA 18.990(4) (specific restrictions on parties that may hold retail, wholesale, and warehouse licenses); MCL 436.30; MSA 18.1001 (manufacturers, warehousemen, and wholesalers barred from assisting other vendors by gift or loan of money or property); MCL 436.30b; MSA 18.1001(2) and MCL 436.30c(1); MSA 18.1001(3)(1) (statutes setting forth the structure for business arrangements between suppliers and wholesalers of beer and wine); the purpose of the statutes is "[t]o promote and maintain a sound, stable, and viable 3-tier system of distribution of [alcoholic beverages] to the public." MCL 436.30b(1)(b); MSA 18.1001(2)(1)(b) and MCL 436.30c(1)(b); MSA 18.1001(3)(1)(b). The act itself states, "This act shall be liberally construed to effect the intent and purposes herein set forth." MCL 436.54; MSA 18.1025.

houseman, wholesaler, outstate seller of beer, outstate seller of wine, outstate seller of mixed spirit drink, or vendor of spirits shall not have an interest directly or indirectly by interlocking directors in a corporation or by interlocking stock ownership in a corporation in the establishment, maintenance, operation, or promotion of the business of any other vendor.

(4) Except as provided in section 31a, a person shall not buy the stocks of a manufacturer, mixed spirit drink manufacturer, warehouseman, wholesaler, outstate seller of beer, outstate seller of wine, outstate seller of mixed spirit drink, or vendor of spirits and place the stock in any portfolio under an arrangement, written trust agreement, or form of investment trust agreement and issue participating shares based upon the portfolio, trust agreement, or investment trust agreement, and sell the participating shares within this state.

The act's statutory definition of "manufacturer" includes brewers, MCL 436.2j; MSA 18.972(10), while "vendor" means a person licensed by the LCC to sell alcoholic liquor, MCL 436.2m(g); MSA 18.972(13)(g), including retailers.

The primary goal of the judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *State Treasurer v Wilson,* 423 Mich 138, 143; 377 NW2d 703 (1985); *Joy Management Co v Detroit,* 176 Mich App 722, 730; 440 NW2d 654 (1989). Statutes are to be construed as a whole; constructions that render a statute or any part of it surplusage are to be avoided. *Niggeling v Dep't of Transportation,* 183 Mich App 770, 775; 455 NW2d 415 (1990). The rules of statutory construction serve as guidelines to assist in determining legislative intent, *Rios v Dep't of State Police,* 188 Mich App 166, 169; 469 NW2d 71

(1991), but once the intention of the Legislature is discovered, it must prevail regardless of any conflicting rule of statutory construction, *Attorney General v American Way Life Ins Co,* 186 Mich App 679, 682; 465 NW2d 56 (1991). Furthermore, the courts will give some deference to the interpretation of a statute by the agency involved in implementing it. *Id.,* at 683.

Petitioners claim that § 31, by its plain terms, is intended to govern tied-house arrangements initiated by manufacturers, wholesalers, and other enumerated licensees with other vendors, but that the Legislature's failure to list retailers among the licensees shows that it did not intend § 31 to govern arrangements entered into by retailers. Petitioners rely on the familiar rule of statutory construction that the express mention of one thing implies the exclusion of others. See *In re Lemmer,* 191 Mich App 253, 256; 477 NW2d 503 (1991). According to petitioners, restrictions on vertical integration by retailers are addressed by a different section of the act, MCL 436.19d; MSA 18.990(4), which provides, in part:

> (2) A specially designated distributor or specially designated merchant or any other retailer shall not hold a mixed spirit drink manufacturer, wholesale, warehouse, outstate seller of beer, outstate seller of mixed spirit drink, or outstate seller of wine license.

Noticeably lacking from § 19d is the express prohibition of a retail licensee holding a manufacturer license for the brewing of beer. Petitioners conclude that the Legislature's failure in § 19d to restrict the holding of a brewer's license by a

retailer shows an intent to allow the practice,[3] and further, that if § 31 were interpreted so as to include retailers, then § 19d would be rendered superfluous. *Niggeling, supra.*

Although we recognize these arguments, we believe that the LCC's determination was correct. The LCC followed the reasoning of *California Beer Wholesalers Ass'n v Alcoholic Beverage Control Appeals Bd,* 5 Cal 3d 402; 96 Cal Rptr 297; 487 P2d 745 (1971), a case remarkably similar to this case.[4] *California Beer Wholesalers Ass'n* concerned

[3] Petitioners bring to our attention the fact that subsection 2 of § 19d was added to the statute by 1969 PA 124, apparently in response to the LCC's grant of a warehouse license to a retailer. See *Borman's, Inc, supra.* Petitioners argue from these facts that, before the amendment of § 19d, even the LCC believed that § 31 did not prohibit retailers from vertically integrating "upstream," as the petitioner retailer in *Borman's* had done before the passage of 1969 PA 124.

On the other hand, in 1969 the Legislature also passed SB 436, which would have added retailers to those licensees prohibited by § 31 from holding interests in other vendors. This bill was vetoed by the Governor on the ground of administrative impracticability, because it would have barred retailers from owning stock in any publicly traded corporation having an interest in alcoholic liquor licenses, including food and hotel chains. See 1969 Journal of the Senate 2240.

[4] Petitioners attempt to distinguish *California Beer Wholesalers Ass'n* by arguing that, unlike this case, *California Beer Wholesalers Ass'n* concerned a single corporation's acquisition of licenses from more than a single tier in California's tied-house scheme. Petitioners only briefly claim the case has no value because in the present case two licensees are involved, a corporation and its wholly owned subsidiary. Petitioners provide no authority for the proposition that two corporations, each solely owned by a single person, operating on the same premises for their mutual benefit, should not be considered a single entity for the purpose of alcoholic beverage licensing and § 31. Nor is there any indication in the record provided this Court of the details of petitioners' proposed corporate organization, other than that the brewer would be a wholly owned subsidiary of Traffic Jam. It is also possible that, even if the two corporations were to be regarded as separate entities, the subsidiary brewer would run afoul of § 31's provision that "a manufacturer . . . shall not have any financial interest, directly or indirectly, in the establishment, maintenance, operation, or promotion of the business of any other vendor." Neither party argues the meaning of "financial interest," and because we will not presume the petitioner corporations are separate entities *for the purpose of alcoholic beverage control,* we will not address the subject.

a corporation organized into two divisions managed and controlled by the same officers and directors. The retail division possessed numerous retail alcoholic beverage licenses. The corporation appealed from the initial denial of its wholesale division's application for a beer and wine wholesaler's license. California's tied-house statutes in relevant part (1) prohibited wholesalers from owning, directly or indirectly, any interest in a retail license,[5] (2) prohibited any retail licensee from holding any ownership or interest, directly or indirectly, in a distilled spirit manufacturer,[6] and (3) contained no express prohibition with regard to a retail licensee holding any interest in a beer and wine wholesaler. The Supreme Court of California summarized:

> Once the retailer of alcoholic beverages acquires a wholesale beer and wine license, that retailer automatically "holds" the wholesale license; he is accordingly a beer and wine wholesaler "holding" a retail liquor license, and this integration of licenses is specifically forbidden by section 25502. To rule otherwise would be to create the anomolous [sic] situation that the right to hold both licenses would depend upon the fortuity of the order in which a party applied for them. But the error of such an incongruous result would go deeper; it would violate the legislative design of segregating wholesale from retail interests; it would permit, rather than prevent, the merging of the marketing functions and powers that the Legislature meant to keep separate. [*Id.* at 404.]

We find this logic persuasive and adopt it as our

We note, however, that petitioners' assertion, if accepted, would elevate form over substance and provide any person operating at any level in the three-tier system a facile method of circumventing public policy through a corporate reshuffling.

[5] Cal Bus & Prof Code, § 25502.

[6] Cal Bus & Prof Code, § 25506.

own. Section 31 applies to holders of retail licenses, and to hold otherwise would set at naught the public policy of this state, clearly expressed by the Legislature, to prevent vertical integration in the alcoholic liquor business. This holding is consistent with the intent of the Legislature in enacting § 31, our overriding concern in matters of statutory construction. It may very well be that brewpubs are desirable features on our economic and social landscapes, but this is not a question for us, nor is the licensing of brewpubs per se the question before us. Rather, the question is whether any holder of a retail license, be the retailer a restaurant or a retailing behemoth that generates millions of dollars in sales, may also be licensed as a manufacturer. As the LCC put it:

> The Commission is fully aware, as pointed out by Petitioner in the Request for Declaratory Ruling . . . that the commonly accepted evil which tied-house prohibitions seek to prohibit is manufacturer control of retail outlets. This is because historically manufacturers have had superior economic influence vis-a-vis retailers. However, in today's business atmosphere it would appear possible, feasible, and perhaps even likely for a large retailer holding liquor licenses to wish to acquire a manufacturer of alcoholic liquor. The Commission would submit that to the extent tied-house arrangements are an evil, the harm is the same regardless of whether it is the manufacturer or the retailer who is the dominant party in the business arrangment.[7]

Affirmed.

---

[7] Petitioners complain at length that the quoted paragraph is a "finding that the proposed licensing is 'evil' as a matter of law [and] is arbitrary, capricious, and an abuse of discretion," as well as being outside the scope of the LCC's authority. We regard the LCC's statement as merely an expression of longstanding public policy.