[Civ. No. 23768.   Second Dist., Div. One.   May 16, 1960.]

DUKE MOLNER WHOLESALE LIQUOR COMPANY, INC. (a Corporation) et al., Appellants, v. THOMAS W. MARTIN, as Director, Department of Alcoholic Beverage Control, et al., Respondents.

Murray M. Chotiner, Russell E. Parsons and Jerome L. Ehrlich for Appellants.

Stanley Mosk, Attorney General, and Edward M. Belasco, Deputy Attorney General, for Respondents.

FOURT, J.—This is an appeal from a judgment which in effect declared a rule of the Department of Alcoholic Beverage Control to be proper and constitutional.

In the third amended complaint for declaratory relief and injunction plaintiffs sought a declaration that rule 28 (the rule in dispute) was unconstitutional and could not be enforced against the plaintiffs. A statement was filed by the parties pursuant to a pretrial conference order which substantially set forth the facts and the issues to be determined. That statement set forth the nature of the case, the plaintiffs' contentions, the defendants' contentions and a copy of rule 28 which reads as follows:

"Rule 28. No distilled spirits wholesaler's license shall be held by any person who does not meet the following qualifications in connection with his premises licensed as his principal place of business:

"1. Maintains warehouse space either owned or leased by him or dedicated to his use in a public warehouse and such space is sufficient to store at one time either

"(a) A stock of distilled spirits equal to 10 percent or more of his annual case volume of distilled spirits sales to retailers within this State, or,

"(b) A stock of distilled spirits whose cost of acquisition is one hundred thousand dollars or more.

"2. Maintains at all times in his warehouse either owned or leased by him or in space dedicated to his use in a public warehouse a stock of distilled spirits consisting of either

"(a) Not less than 5 percent of his annual sales to retailers within this State, or,

"(b) Whose cost of acquisition is one hundred thousand dollars or more.

"The stock of distilled spirits herein required shall be: (a) owned by him, (b) not held on consignment, (c) not acquired pursuant to a prior agreement to sell it to a specific licensee or licensees.

"3. Sells distilled spirits to retailers generally rather than a selected few retailers.

"(a) A wholesaler who sells to 25 percent of the retailers in the county wherein his wholesale licensed premises are located, or a wholesaler whose total volume of sales of distilled spirits to retailers during any 12-month period consists of 50 percent or more of individual sales in quantities of 10 cases or less shall be conclusively presumed to be selling to retailers generally." This rule became effective June 1, 1957.

The court made a comprehensive "memorandum of decision" which has been helpful and with which this court agrees. There was little or no dispute about the facts at the trial. The court made findings of fact, conclusions of law and awarded a judgment for the respondents.

A résumé of the facts is as follows:

The four appellants, Duke Molner Wholesale Liquor Company, Inc., a corporation; Joseph M. Armelli, doing business as Associated Liquor Products Company; Stewart-Reynolds Company, Inc., a corporation and Jay L. Ambrose, doing business as Kentucky Wholesale Company (hereinafter referred to respectively as Molner, Ambrose, Stewart and Armelli), were each engaged in what was termed the wholesale liquor business in California and were so licensed by the Department of Alcoholic Beverage Control (hereinafter referred to as Department).

The appellants generally obtained their bourbon whiskey from distillers in Kentucky by way of trucks or railroad cars, their gin and vodka from Boston by way of steamships and some items of distilled spirits from Fresno and Sacramento. The shipments from the Eastern states required two weeks or more before delivery in Los Angeles.

In the first instance when rule 28 was proposed the appellants appeared and opposed the adoption of such rule. After

the rule was adopted this action was instituted and the relief heretofore mentioned was sought.

In the case of Molner the evidence disclosed that Molner had been licensed for eight years, that its place of business was on the sixth floor of Bekins Van and Storage Building on North Highland in Los Angeles where it had allotted to it 3,000 square feet of storage with more available if needed, that there was a capital investment of $40,000.00 in the business and in addition to Duke Molner, there were three salesmen, an order clerk, bookkeeper and a truck driver. Bulk whiskey was purchased from brokers in Los Angeles and in the East. About 60 percent of the liquor Molner kept on hand was bourbon whiskey and the remaining 40 percent was distilled spirits received from some other source. Molner sold about 70 percent of its distilled spirits to chain stores and discount houses and 30 percent to small independent stores. About 12 of its customers accounted for 70 percent of its business. Liquor was sold to all retailers who were financially accountable and who placed their orders with it. Part of Molner's business consisted of handling pre-sold merchandise, that is, it would secure an order from a retail customer before placing its own order with the distillery or rectifier. Such presold merchandise was taken from its warehouse as soon as practicable. From June 1, 1956 to May 31, 1957 Molner sold 18,491 cases of distilled spirits to retailers of the value of $648,117.17. Five percent of the annual case sales was 924.55 cases and 5 percent of such sales in dollars was $32,405.86. Molner had on hand in the warehouse on the first day of each month during said year quantities ranging from 477 cases in June, 1956 to 1532 cases in February of 1957 and the value thereof varied from $16,344.96 to $48,601.45.

As to Armelli, he was a rectifier of distilled spirits and had been in such business since 1933 and was licensed as a wholesaler since 1948. He sold to retailers and wholesalers and excluding the building he occupied his investment in the business was about $30,000. He sometimes took orders in advance and then prepared the merchandise to fill such orders. From June 1, 1956 to May 31, 1957 he sold 13,930 cases of distilled spirits valued at $439,069.05 to retailers. Five percent of such sales in cases was 696.50. He had on hand in his warehouse on the first day of each month during said year, cases ranging in quantity from 369 in January 1957 to 955 in October, 1956 and the value of said cases ranged from $10,110 to $23,167.00.

As to Stewart it had held a wholesale liquor license for six years and was the successor of an individual who had had a wholesale license for 20 years. It had its place of business on North Highland and in two other warehouses in Los Angeles. It had a capital investment of $250,000 of which $65,000 belonged to the individual predecessor. It sold bourbon and scotch whiskey, rum and rectified spirits to any retailer who could pay for the liquor. Some of its sales were based upon orders received previous to obtaining the liquor from a supplier. From June 1, 1956, to May 31, 1957 it sold 40,803 cases of distilled spirits of the value of $1,590,032.63 to retailers. It had on hand in the warehouse on the first day of each month during said year cases ranging in quantity from 1,594 in March, 1957 to 4,921 in November, 1956 and the value of such cases ranged from $69,017.30 for the first quarter ending August, 1956 to $156,082.11 for the quarter ending November, 1956. Five percent of its annual case sales to retailers for said year was 2,040.15 cases.

As to Ambrose, it had been licensed for four years and the place of business was located on East Second Street in Los Angeles where it had 4,400 square feet of warehouse space and 2,000 square feet of office space. There was capital investment of about $40,000 in the business and three salesmen were employed. Bourbon whiskey was handled exclusively and most of the purchases were made from two distilleries in Kentucky. Sales were made to retailers generally. In some instances orders were first obtained from retailers before an order would be placed with the distillery. During the period from June 1, 1956 to May 31, 1957, 25,218 cases of distilled spirits valued at $923,015.43 were sold to retailers. Ambrose had on hand in the warehouse on the first day of each month cases ranging in quantity from 16 in March, 1957 to 1,234 in November, 1956 and the value of such cases ranged from $543.48 in March, 1957 to $44,420 in November, 1956. That 5 per cent of the annual case sales to retailers was 1,260.90 cases.

Appellants assert that (1) rule 28 is invalid, and (2) that the findings of fact are insufficient.

Section 22 of article XX of the California Constitution granted to the Legislature the power to enact laws governing and controlling the liquor industry and to license those engaged in it and created the Department, granting to such Department the power and duty to enforce the terms of the Constitution and the laws enacted by the Legislature concern-

ing the manufacture, sale and consumption of alcoholic beverages. Pursuant to the constitutional directive the Legislature enacted the Alcoholic Beverage Control Act. (Bus. & Prof. Code, §§ 23000-25762.) Any section hereafter referred to will be of the Business and Professions Code unless otherwise stated.

Section 23001 states the purpose of the act as follows: "This division is an exercise of the police powers of the State for the protection of the safety, welfare, health, peace, and morals of the people of the State, to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic beverages. It is hereby declared that the subject matter of this division involves in the highest degree the economic, social, and moral well-being and the safety of the State and of all its people. All provisions of this divison (sic) shall be liberally construed for the accomplishment of these purposes."

The "economic" welfare which will be achieved by strict regulation and curtailment of the use of liquor and the economic benefits resulting to the people from the promotion of temperance, rather than those resulting from the promotion of the liquor industry is the welfare which is meant by such section. (*American Distilling Co.* v. *State Board of Equalization,* 144 Cal.App.2d 457 [301 P.2d 495].)

The Legislature in this particular field of activity has made it mandatory upon the Department to make rules and regulations necessary to carry out the intent and purposes of the constitutional provisions. (§ 25750.) Pursuant to such mandate the Department adopted rules and regulations including among others rule 28. See title 4, chapter 1, sections 1-145, California Administrative Code; *Sibert* v. *Department of Alcoholic Beverage Control,* 169 Cal.App.2d 563 [337 P.2d 882]; *Joseph George, Distr.* v. *Department of Alcoholic Beverage Control,* 149 Cal.App.2d 702 [308 P.2d 773] and *Mercurio* v. *Department of Alcoholic Beverage Control,* 144 Cal.App.2d 626 [301 P.2d 474].

There is in this state as a result of the constitutional provisions, Legislative enactment and administrative rules and regulations, a complete and comprehensive set of laws which cover the liquor industry. It is generally agreed that the liquor industry is one which greatly affects the public health, safety, welfare and morals of the people (*Schaub's, Inc.* v. *Department of Alcoholic-Beverage Control,* 153 Cal.

App.2d 858, 867 [315 P.2d 459]), that those in the industry must operate subject to strict control of constitutional authorities. (*Cooper* v. *State Board of Equalization*, 137 Cal.App.2d 672, 679 [290 P.2d 914].) ▇ Each applicant for a license must provide the department with certain information with reference to the applicant's background, crime record, status and other data (§§ 23950-23958), and must subject himself and the premises where the business will be conducted to a thorough investigation. (*Weiss* v. *State Board of Equalization*, 40 Cal.2d 772 [256 P.2d 1].)

Section 23779 reads as follows: ''No wholesale license shall be issued to any person who does not in good faith actually carry on or intend to carry on a bona fide wholesale business by sale to retail licensees of the alcoholic beverage designated in the wholesale license, and the department may revoke any wholesale license when the licensee fails for a period of 45 days actively and in good faith to engage in the wholesale business and shall revoke any distilled spirits wholesaler's license held by any person who fails to comply with applicable provisions of Sections 23378, 23379, 23776, 23777, and 23778. Sale by a wholesale licensee to himself as a retail licensee is not the transaction of a bona fide wholesale business.''

A wholesaler is restricted by section 23780 which reads as follows: ''No distilled spirits wholesaler's license or rectifier's license shall be issued or renewed to any person who holds on deposit funds obtained from any retailer, which funds were obtained for the purpose of applying them, either in whole or in part, toward the payment of any future delivery of distilled spirits to the retailer.''

And, section 23778 reads as follows: ''A distilled spirits wholesaler's license shall not be held by any person *unless at all times throughout the license year he has on his wholesale premises a reasonable stock of distilled spirits, as determined by the department, for which he has fully paid lawful money or its equivalent.*'' (Emphasis added.)

The trial judge in his memorandum of decision stated the following with reference to the last quoted section:

''Having in mind the plenary power of the legislature, the section quoted last above lays down the valid requirement that none may hold a distilled spirit wholesaler's license 'unless at all times throughout the year he has on his wholesale premises a reasonable stock of distilled spirits, *as determined by the department,* . . .' The effect thereof is the prescription of requirements (1) that the maintenance of a reasonable stock

on hand is a prerequisite to holding this type of license and (2) the Department of Alcoholic Beverage Control shall determine what constitutes 'a reasonable stock of distilled spirits.'

"The department has performed that duty by promulgating rule 28, which prescribes minimum requirements which all such licensees must meet. Even if we consider the absurd situation of a wholesaler making only sales of one dollar or of any amount up to two million dollars per year the same yard stick, of five per cent, is applied, and he is required to keep on hand slightly over a two weeks' average supply. There is no discrimination or unequal application in such a provision. On its face it appears to negate the allegations in that regard."

As we view it rule 28 is the result of a valid exercise of the police power and is constitutional. By adopting the rule the Department simply, among other things, determined what constitutes "a reasonable stock of distilled spirits." The rule provides minimum requirements which all wholesalers must meet and there can be no legitimate claim that there is any discrimination or unequal application in the rule.

The plaintiffs' main contention is that they do not have sufficient capital to keep on hand a stock equal to 5 per cent of their annual sales, which latter for each is between $483,392 and $1,402,269.33. But lack of capital is no reason to invalidate the rule under the circumstances of this case. As the trial court stated:

". . . Probably there is no license law laying down prerequisites, but someone is unable to comply, whether the precedent is education, training, proof of character, a bond or stock of merchandise. In fact, one of the major purposes behind most licensing laws is to restrict activity in the field to those who can qualify and to prohibit it by those who cannot."

There was no evidence introduced other than the plaintiffs' inability to provide such funds, to show that the 5 per cent figure was too high. The trial court pointed out that:

". . . The evidence on behalf of defendants (exh. D) shows that before promulgating the rule, the department ascertained (1) there is a general practice to reduce inventories on March first to the lowest point during the year because of taxes and (2) that of 143 distilled spirit wholesalers reporting, the average inventory on March 1, 1956 (prior to the rule) was eleven per cent of annual sales. The rule establishes a requirement less than half thereof. This negates any claim of discrimination or unreasonableness."

■ Contrary to the appellants' contention that part of the rule reading "the stock of distilled spirits herein required shall be: (a) owned by him, (b) not held on consignment, (c) not acquired pursuant to a prior agreement to sell it to a specific licensee or licensees" neither permits nor prohibits advance sales, it merely provides that pre-sold merchandise shall not be counted in the stock required to be kept on hand in the warehouse.

In other words it provides in effect that the stock kept on hand shall not be held on consignment nor be acquired pursuant to prior sales agreement with a retailer. It means that stock belonging to someone other than the licensee or stock which is pre-sold will not be counted in the stock required to be kept on hand in the warehouse.

■ One of the purposes of the Alcoholic Beverage Control Act is to bring into being a class of true wholesalers to whom retailers can come for their supplies and be certain that they are dealing with a bona fide wholesaler and not dealing with a phone-order business concern, a commission merchant or a distiller's representative.

Some idea of the importance of the rule is gained when it is considered that as of April 1, 1957, there were 17,301 licensed retail premises in California selling distilled spirits and these retailers had to purchase their liquor from licensed wholesalers, no other means of purchase being lawful. (§§ 23374.5, 23375.5, 23378.)

■ As to the size of the warehouse, the Department under the first qualification wanted to make certain among other things that a wholesaler has a bona fide place of business where retailers may go to view, select and obtain merchandise. It would be of little use to determine the extent of a "reasonable stock" if the licensee had no place to store it.

■ As to the third provision, it is apparent that the Department wanted to provide that each wholesaler will be available to all retailers, thereby giving every retailer the right to buy from anyone in the licensed class with whom he must deal and thereby preventing the recurrence of the "tied-house" which promoted restraints of trade during pre-prohibition times. (*Black* v. *Magnolia Liquor Co., Inc.*, 355 U.S. 24 [78 S.Ct. 106, 2 L.Ed.2d 5].)

■ The final paragraph of the rule provides that certain licensees who sell to a certain percentage of the retailers in the county where their licensed premises are located or

those whose sales of spirits during any 12-month period consist of 50 percent or more of individual sales in quantities of ten cases or less are conclusively presumed to be selling to retailers generally. This is not a minimum requirement but is merely a measuring device whereby those who can meet either of such categories are conclusively presumed to be selling to retailers.

The appellants have failed to establish that the rule is invalid. ▇ An administrative rule which is legislative in character is subject to the same test with reference to its validity as is an act of the Legislature. (*Knudsen Creamery Co.* v. *Brock,* 37 Cal.2d 485, 494 [234 P.2d 26].) ▇ The same principles govern administrative rules as govern statutes. (*California Drive-In Restaurant Assn.* v. *Clark,* 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028].) The presumption is that the rule under the circumstances set forth in this instance is reasonable and proper. (*Bess* v. *Park,* 144 Cal. App.2d 798, 804 [301 P.2d 978].)

▇ The Department is well within its rights to require a high standard of economic stability for those who are to hold wholesalers licenses. (*Schaub's, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 153 Cal.App.2d 858.)

As to appellants' last contention. A complete reading of the record indicates that the court made comprehensive and sufficient findings. We think that it was not required that findings be made as to those particular matters referred to in the appellants' brief.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied June 1, 1960, and appellants' petition for a hearing by the Supreme Court was denied July 12, 1960.