[Civ. No. 48746. Second Dist., Div. Three. Aug. 26, 1976.]

PRONTO MARKET NO. 1, INC., Petitioner, v.
ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD,
Respondent;
DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL,
Real Party in Interest.

**COUNSEL**

White, Price, Peterson & Robinson, Edward E. Weissman and M. Richardson Lynn, Jr., for Petitioner.

Evelle J. Younger, Attorney General, and Marilyn Mayer Moffett, Deputy Attorney General, for Respondent.

No appearance for Real Party in Interest.

**OPINION**

**FORD, P. J.**—Petitioner Pronto Market No. 1, Inc., seeks review of a decision of the Alcoholic Beverage Control Appeals Board (hereinafter designated as Board) denying petitioner's application for a type 9 beer and wine importer's license.

The issue presented in this matter is whether the tied-house restrictions contained in the Alcoholic Beverage Control Act (Bus. &

Prof. Code, § 25500 et seq.)[1] prohibit issuance of a type 9 beer and wine importer's license (§ 23320, subd. (9)) to petitioner because petitioner already holds a winegrower's license (§ 23320, subd. (2)) and an off-sale general license (§ 23320, subd. (21)).

Section 25502, upon which the Board primarily relied in denying petitioner's application, provides in pertinent part as follows: "No manufacturer, winegrower, . . . importer, or wholesaler, or any officer, director, or agent of any such person, shall, except as authorized by this division: (a) Hold the ownership, directly or indirectly, of any interest in an off-sale general license. . . ."

The purposes for and historical development of the tied-house restrictions were discussed by our Supreme Court in the case of *California Beer Wholesalers Assn., Inc.* v. *Alcoholic Bev. etc. Appeals Bd.,* 5 Cal.3d 402 [96 Cal.Rptr. 297, 487 P.2d 745], wherein the court stated (pp. 407-408): "Following repeal of the Eighteenth Amendment, the vast majority of states, including California, enacted alcoholic beverage control laws. These statutes sought to forestall the generation of such evils and excesses as intemperance and disorderly marketing conditions that had plagued the public and the alcoholic beverage industry prior to prohibition. [Citations.] By enacting prohibitions against 'tied-house' arrangements, state legislatures aimed to prevent two particular dangers: the ability and potentiality of large firms to dominate local markets through vertical and horizontal integration [citation] and the excessive sales of alcoholic beverages produced by the overly aggressive marketing techniques of larger alcoholic beverage concerns [citations].[7] [Fn. 7 is as follows: " 'Underlying the tied-house prohibition is the assumption that the retail market for alcoholic beverages is elastic and that price cutting, aggressive marketing techniques, and similar practices tend to increase consumption and threaten the legislative goal of temperance.' [Citations.]"] [¶] The principal method utilized by state legislatures to avoid these anti-social developments was the establishment of a triple-tiered distribution and licensing scheme. [Citations.] Manufacturing interests were to be separated from wholesale interests; wholesale interests were to be segregated from retail interests. In short, business endeavors engaged in the production, handling, and final sale of alcoholic beverages were to be kept 'distinct and apart.' (25 Ops.Cal.Atty.Gen. 288, 289 (1955).) [¶] In the era when most tied-house statutes were

---

[1]All code references herein are to the Business and Professions Code unless otherwise specified.

enacted, state legislatures confronted an inability on the part of small retailers to cope with pressures exerted by larger manufacturing or wholesale interests.[8] [Citations.] [Fn. 8 is as follows: "The purpose of tied-house prohibitions was 'to prevent the integration of retail and wholesale outlets and to remove retail dealer [*sic*] in intoxicating liquors from financial or business obligations to the wholesaler, with the exception of ordinary commercial credit for liquors sold.' (*Pickerill* v. *Schott* (Fla. 1951) 55 So.2d 716, 718 (quoting from 48 C.J.S., § 197, at p. 329).) '[T]he prohibition . . . exists primarily to remove the influence by the manufacturer over the wholesaler and the wholesaler over the retailer, a practice which might result in preference for the manufacturer's or wholesaler's product. . . .' 32 Ops.Cal.Atty.Gen. 75, 76 (1958)."]"

In *California Beer Wholesalers Assn., Inc., supra,* our Supreme Court further stated (5 Cal.3d at p. 408): "Consequently, most of the statutes enacted during this period (1930-1940) manifested a legislative policy of controlling large wholesalers; the statutes were drafted in sufficiently broad terms, moreover, to insure the accomplishment of the primary objective of the establishment of a triple-tiered system. All levels of the alcoholic beverage industry were to remain segregated; firms operating at one level of distribution were to remain free from involvement in, or influence over, any other level. Thus, although the most significant development in the industry since the 1950's has been the growth of large retail chains, the alcoholic beverage statutes enacted in the 1950's are sufficiently broad to control industry-wide domination by large retail chains as well. [Fn. omitted.] [¶] In addition, most statutes placed more stringent requirements on interests dealing in distilled spirits than on those dealing exclusively in beer and wine. Legislatures were especially concerned with the prevention of intemperance in the consumption of distilled spirits, since distilled spirits, of course, contain a significantly higher alcoholic content than beer and wine. Further, since distilled spirits may not deteriorate as rapidly as some beer and wine, legislatures were particularly fearful of the possibility that wholesalers of distilled spirits would foist even greater inventories upon local retailers. (Cf. *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 186, fn. 1 [70 Cal.Rptr. 407, 444 P.2d 79] (dissenting opn. of Burke, J.).)"

Despite the manifest purpose of the tied-house restrictions to prohibit integration of retail and wholesale outlets, an exception to that policy

was allowed by the Legislature in favor of California winegrowers and brandy manufacturers when it enacted section 23362, which provides as follows: "Notwithstanding any other provisions of this division [division 9], a licensed winegrower or brandy manufacturer may be issued and may hold an offsale general license. . . ." An off-sale general license allows the holder to sell beer, wine and distilled spirits "to consumers only and not for resale" for consumption off the premises where sold, (§§ 23393, 23394.)

The concept that a winegrower may also have an off-sale general license may evoke a picture of a simple stand beside the vineyard where the winegrower sells his bottled product to consumers. Analysis of the Alcoholic Beverage Control Act, however, makes it clear that a winegrower with an off-sale general license may purchase any amount of wine or brandy from any winegrower, brandy manufacturer or importer and sell it along with his own wine to consumers without the necessity of dealing with a wholesaler. Under section 23356 a winegrower may produce wine, export wine whether it is produced by him or any other person, and sell only such alcoholic beverages as are packaged by or for him and only to wholesalers, manufacturers, other winegrowers, et cetera. Section 23358 provides, however, that winegrowers may also sell wine and brandy to "any person holding a license authorizing the sale of wine or brandy" (including retailers) and to consumers for consumption off the premises where sold.[2] Section 23358 also allows winegrowers to maintain "a bona fide eating place" on their premises or contiguous thereto wherein they are allowed to sell wine and brandy to consumers for consumption on the premises. In addition to these incidents of a winegrower's license, section 23356.1 provides that a winegrower may conduct winetastings of his wine or wine bottled for him either on or off his premises. If the privileges of an off-sale general license are added to those allowed under a winegrower's license, it is clear that a winegrower may sell wine, brandy, beer and distilled spirits to consumers for consumption off the premises in addition to being able to sell wine and brandy to wholesalers and retailers.

While a licensed wholesaler is strictly prohibited from dealing exclusively with just one retailer (§ 23779; *Louis Stores, Inc.* v.

[2]Under section 23358.2 winegrowers selling to consumers for consumption off the premises may sell only wine or brandy produced or bottled by the winegrower or wine or brandy produced for or produced and packaged for the licensee and sold under a brand name owned by the licensee.

*Department of Alcoholic Beverage Control,* 57 Cal.2d 749, 759 [22 Cal.Rptr. 14, 371 P.2d 758]), there is nothing in the Alcoholic Beverage Control Act which prevents a winegrower who also holds an off-sale general license from dealing exclusively with himself as a retailer. Under the license now held by petitioner in this case, it could buy wines produced by various producers in California and cause the wines to be transferred to itself to be resold directly to consumers under its general off-sale license.

While our research has revealed no legislative material enunciating the specific reasons for the less restrictive treatment accorded winegrowers and brandy manufacturers under the Alcoholic Beverage Control Act, it is clear that the difference in treatment has existed for some time. In 1935, when the Alcoholic Beverage Control Act was enacted, the tied-house restrictions applied only to the interest of a manufacturer, distiller, importer, or wholesaler in an on-sale license or premises. (Stats. 1935, ch. 330, § 54, p. 1148.) In 1937 section 54 was amended to provide in subdivision (f) that, in addition, no manufacturer, distiller, importer, or wholesaler could hold an interest in any off-sale distilled spirits license other than for such licensee's wholesale premises. (Stats. 1937, ch. 758, § 87, pp. 2170-2171.) In 1941 a provision was added allowing a licensed wine or brandy manufacturer to hold an off-sale distilled spirits license for his licensed premises and any branch offices. (Stats. 1941, ch. 1044, § 1, pp. 2706-2707.) In 1945 licensed winegrowers and brandy manufacturers were first allowed to hold an off-sale general license, but only for their own premises or branch offices. (Stats. 1945, ch. 1401, § 4, p. 2627.) Under the 1959 amendment to section 23362 a licensed winegrower or brandy manufacturer was allowed to hold an off-sale general license without limiting the license to his own premises or branch offices. (Stats. 1959, ch. 750, § 4, p. 2738.) Section 25502 was amended in 1969 (Stats. 1969, ch. 759, § 1, p. 1518) to add, among other things, the following language: "Nothing in this section shall alter, change, or otherwise affect, retroactively or prospectively, any of the rights or privileges granted to a winegrower or brandy manufacturer by Section 23362 of this code, or by any other provision of this division." Thus winegrowers are specifically exempted from the tied-house restrictions pertaining to off-sale general licenses.

Petitioner seeks to add to its privileges held as a result of its winegrower's license and its off-sale general license the privileges

accorded a person holding a type 9 importer's license (§ 23320, subd. (9)).[3] An importer's license may be issued only to a person who holds a license authorizing the sale for resale of the type of alcoholic beverage mentioned in the importer's license. (§ 23775.) Thus in order to qualify for an importer's license an applicant must already hold a manufacturer's, a winegrower's, a wholesaler's or some other license which authorizes sale for resale. However, only the holder of a distilled spirits importer's general license or a beer and wine importer's general license may *sell* to manufacturers, wholesalers and other general importers. (See §§ 23374.5, 23374.6.) The holder of a simple importer's license, such as the type 9 wine importer's license sought by petitioner here, may only transfer the alcoholic beverages designated in the license to himself under another license. (§ 23374.)

■ While it is clear that a winegrower may hold an off-sale general license and that nothing in the Alcoholic Beverage Control Act specifically prohibits a winegrower from obtaining a type 9 beer and wine importer's license, section 25502 clearly provides that no importer shall hold "the ownership, directly or indirectly, of any interest in an off-sale general license." Petitioner, of course, is not an importer seeking an interest in an off-sale general license but, rather, a winegrower and general off-sale licensee seeking to hold an importer's license. We note that section 25506, which pertains to restrictions on the ownership interests of off-sale general licensees, provides only that "[e]xcept as authorized by this division, no off-sale general licensee, or any officer, director, employee, or agent of such licensee, shall hold any ownership or interest, directly or indirectly, in the business, property, or license of any distilled spirits wholesaler, rectifier, distilled spirits manufacturer, or distilled spirits manufacturer's agent." That section by its terms does not forbid an off-sale general licensee from acquiring an importer's license.

The seemingly anomalous relationship between sections 25502 and 25506 was considered by our Supreme Court in *California Beer Wholesalers Assn., Inc.* v. *Alcoholic Bev. etc. Appeals Bd., supra*, 5 Cal.3d 402. In that case Thriftimart, Inc., the holder of 73 off-sale general

---

[3]There are five different importer's licenses for which provision is made in section 23320, subdivisions (9)-(13), including a beer and wine importer's license (9), a beer and wine importer's general license (10), a brandy importer's license (11), a distilled spirits importer's license (12), and a distilled spirits importer's general license (13). Of these five different types of license only the two general licenses require the payment of a fee before issuance.

licenses for 73 of its 77 retail grocery-store outlets, applied for a beer and wine wholesaler's license for its wholesale division, Smart and Final Iris Company. At the hearing on the application the hearing officer found that Thriftimart, Inc., if granted the license, would not violate section 23779 by selling exclusively to its retail outlets; however, the hearing officer decided that a single firm could not hold both an off-sale retail license and a wholesale liquor license without violating the tied-house restrictions of section 25502. The department agreed with the hearing officer but the Board reversed the department's decision, reasoning as follows: "Section 25502 provides that *no wholesaler of beer, wine, or distilled spirits* [fn. omitted] shall hold any interest in a retailer's off-sale liquor license. Section 25506 provides that no holder of a *retailer's* off-sale license shall possess any interest in a firm holding a *distilled spirits* wholesaler's license. By forbidding a retailer from holding only a distilled spirits wholesaler's license, section 25506 might be construed under the doctrine of *inclusio unius est exclusio alterius* to suggest that a retailer is free to acquire a wholesaler's beer and wine license." (5 Cal.3d at p. 406.)

In *California Beer Wholesalers Assn., Inc., supra,* our Supreme Court reversed the Board's decision, holding that section 25502 necessarily prohibits the holder of an off-sale retail license from obtaining a beer and wine wholesaler's license. The court reasoned as follows (5 Cal.3d at pp. 410-411): "Contrary to the board's assertion, section 25502 and section 25506 are neither inherently nor fundamentally in conflict. As it stood at the time of the application of Thriftimart, Inc.—prior to its amendment in November 1969—section 25502 prohibited, in general terms, integration between wholesale and retail interests dealing in alcoholic beverages. [Fn. omitted.] Section 25506, on the other hand, placed more stringent and particular restraints upon those interests dealing in distilled spirits. Thus, although section 25502 prohibited a general wholesaler of beer, wine, or distilled spirits from owning an interest in the *license* or *premises* of an off-sale retailer, section 25506 prohibited an off-sale retailer from having any interest in the *business, property,* or *license of a distilled spirits wholesaler.* In other words, the Legislature framed the ban that forbade the retailer from holding an interest in a distilled spirits wholesaler in much stronger and more formidable terms than the direct prohibition against the retailer's ownership of an interest in the license or premises of a wholesaler. Section 25506 therefore was not drawn to *limit* in any way the more

general policy of segregation announced in section 25502. That the Legislature later amended and expanded the prohibitions of section 25502 to correlate them with section 25506 does not serve to impair the legislative design or to diminish the effect of the ban of section 25502. [¶] We therefore reject the contention that because section 25506 does not specifically *prohibit* a retailer from possessing an interest in a beer and wine wholesale license, it creates an inference that it *permits* a retailer to possess an interest in such a license. To argue that section 25506 should be interpreted to sanction such dual licensing because the section does not *specifically* prohibit the retail off-sale licensee from holding a wholesale beer and wine license is to overlook the legislative prohibition of such consolidation of licenses in section 25502. The Legislature was not required to *repeat* that prohibition in section 25506. Further, as we have noted, the attempt to use section 25506 to nullify the general prohibition of section 25502 would also nullify the Legislature's basic objective of erecting a triple-tiered system of distribution and licensing and would thereby weaken the entire framework of the statutory structure."

Adhering to the reasoning of our Supreme Court in *California Beer Wholesalers Assn., Inc.,* in the instant case it is clear that if petitioner were granted a type 9 importer's license it would then be an importer holding an off-sale general license in direct violation of the terms of section 25502.

Petitioner argues, however, that the Legislature has exempted wine-growers from the tied-house restrictions, stating: "Once the legislature determined to permit licensed winegrowers to sell at retail (§ 23362), the tier separation was effectively broken down by virtue of the very nature of the winegrower's function.[4] Acquisition of a type 9 importer's license would do nothing more than permit petitioner to bring in additional wines from outside the state of California to be sold at retail." Petitioner points to the 1969 amendment to section 25502 which provides as follows: "Nothing in this section shall alter, change, or otherwise affect, retroactively or prospectively, any of the rights or privileges granted to a winegrower or brandy manufacturer by Section 23362 of this code, or by any other provision of this division." Petitioner argues that since nothing

---

[4]Petitioner here refers to the fact that a licensed winegrower with an off-sale general license has the right to acquire California domestic wines from other persons in unlimited quantities and to sell such wines at retail as well as to produce its own wines and sell them at retail.

in the act prohibits a winegrower from holding a type 9 importer's license, such a license is one of the privileges allowed to a winegrower by the provisions of division 9 which privilege is not affected by the tied-house restrictions of section 25502.

A licensed winegrower is not totally exempted from the tied-house restrictions. Section 25500, which contains the prohibition against the holding of any interest in an on-sale general license, is clearly still applicable to a winegrower. Furthermore, there is no specific provision of the act which grants a winegrower the "right or privilege" of holding an importer's license, let alone the "right or privilege" of holding an importer's license in addition to an off-sale general license. But there are some provisions of division 9 which specifically grant particular "rights and privileges" to a winegrower, in addition to section 23362, which appear to conflict with the basic objectives of the tied-house restrictions. Among them are the provisions which grant a winegrower on-sale rights at a restaurant on or contiguous to his licensed premises (§ 23358) and off-sale privileges at his licensed premises as to wine and brandy produced or bottled by him (§§ 23358, 23358.2). It is undoubtedly specific provisions of this nature, in addition to section 23362, which the Legislature had in mind when it enacted the 1969 amendment to section 25502.

While the Legislature has clearly relaxed the tied-house restrictions with respect to winegrowers, it has not moved in the direction of relaxing those restrictions with respect to importers. A licensed winegrower has no right to import wine. In order to exercise the privileges of an importer, petitioner must have an importer's license, and while engaging in the importing business petitioner would exercise those rights accorded to it under its importer's license, not those accorded to it as a licensed winegrower.

While the Legislature has enacted some exceptions to the tied-house restrictions in favor of various types of licensees, it is also true that the Legislature has been careful to enact specific provisions restricting the license ownership interests available to each new classification of licensee created by the Legislature. (See § 23356.8 (no interest in any retailer's license for wineblender); §§ 23375.5 and 23375.6 (no distilled spirits importer general licensee or beer and wine importer general licensee may hold any interest in retail license and vice versa); § 23373.1

(holder of wholesaler's license or of any retail license may not hold California winegrower's agent's license); § 23368.1 (no distilled spirits rectifier's license permitted for anyone with interest in an on-sale or off-sale general license).)

■ A state has broad powers to control the sale of alcoholic beverages within its borders, and the provisions of the Alcoholic Beverage Control Act are to be liberally construed to effect its purposes. (*Kirby* v. *Alcoholic Bev. etc. Appeals Bd.,* 33 Cal.App.3d 732, 735 [109 Cal.Rptr. 291].) Section 23001 provides: "This division [division 9] is an exercise of the police powers of the State for the protection of the safety, welfare, health, peace, and morals of the people of the State, to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic beverages. It is hereby declared that the subject matter of this division involves in the highest degree the economic, social, and moral well-being and the safety of the State and of all its people. All provisions of this division shall be liberally construed for the accomplishment of these purposes."

As was said in *Duke Molner etc. Liquor Co.* v. *Martin,* 180 Cal.App.2d 873, at page 880 [4 Cal.Rptr. 904]: "The 'economic' welfare which will be achieved by strict regulation and curtailment of the use of liquor and the economic benefits resulting to the people from the promotion of temperance, rather than those resulting from the promotion of the liquor industry is the welfare which is meant by such section. [Section 23001.] (*American Distilling Co.* v. *State Board of Equalization,* 144 Cal.App.2d 457 [301 P.2d 495].)"

■ Until the Legislature specifically moves to exempt either importers in general or winegrowers who hold importer's licenses from the tied-house restrictions of section 25502, a construction of the statutory scheme involved herein to allow petitioner the third type of license sought by it would be inconsistent with the Legislature's expressed intention of erecting a triple-tiered system of distribution and licensing and would weaken the entire framework of the statutory structure. In light of the legislative injunction that provisions of division 9 be construed liberally to further the purposes of the act, we hold that the

Board properly construed section 25502 and we affirm the Board's decision denying petitioner's application for a type 9 wine importer's license.

The decision of the Alcoholic Beverage Appeals Board is affirmed.

Allport, J., and Potter, J., concurred.