[No. A107773. First Dist., Div. Five. Apr. 29, 2005.]

DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, Petitioner, v. ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent; SCHIEFFELIN & SOMERSET CO., Real Party in Interest.

## COUNSEL

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Jacob A. Appelsmith, Assistant Attorney General, and Miguel A. Neri, Deputy Attorney General, for Petitioner.

No appearance for Respondent.

Pillsbury Winthrop, James M. Seff, Kevin M. Fong and J. Daniel Davis for Real Party in Interest.

## Opinion

**GEMELLO, J.**—This case involves the construction of Business and Professions Code sections 25500, subdivision (a)(2) and 25503, subdivision (h),[1] and California Code of Regulations, title 4, section 106, subdivision (i)(2). The Department of Alcoholic Beverage Control (Department) suspended the license of real party in interest, Schieffelin and Somerset Company (Schieffelin), an alcoholic beverage supplier, for violating these statutes by paying an event promoter for cosponsorship of a race sponsored by Chevys Restaurants, an alcoholic beverage retailer, and for the placement of advertising for Schieffelin's product on Chevys' premises. The Department also concluded that the administrative rule, which permits alcoholic beverage suppliers to sponsor contests, races, tournaments, and similar activities held by "bona fide amateur or professional organizations established for the encouragement and promotion of the activities involved" (Cal. Code Regs., tit. 4, § 106, subd. (i)(2); hereafter Rule 106(i)(2)),[2] did not exempt Schieffelin from the coverage of the statutes, commonly known as the tied-house restrictions, as explained in part II.

Schieffelin appealed to the Alcoholic Beverage Control Appeals Board (Board), which reversed the suspension ordered by the Department. The Department then successfully petitioned this court for a writ of review. We conclude that the Board erred and accordingly set aside its decision.

### Factual Background

Schieffelin is a wholesale distributor of alcoholic beverages in California and holds an out-of-state distilled shipper's certificate issued by the Department. Schieffelin distributes Grand Marnier liqueur to California retail licensees, including Chevys, Inc., which operates Chevys Restaurants, a national restaurant chain specializing in Mexican-style food. Chevys is also a Department licensee and holds numerous California on-sale retail licenses.

---

[1] Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

Section 25503 provides in part: "No . . . wholesaler, or any officer, director, or agent of any such person, shall do any of the following: [¶] . . . [¶] (h) Pay money or give or furnish anything of value for the privilege of placing or painting a sign or advertisement, or window display, on or in any premises selling alcoholic beverages at retail."

Section 25500, subdivision (a)(2) provides in part: "No . . . wholesaler, or any officer, director, or agent of any such person shall: [¶] . . . [¶] (2) Furnish, give, or lend any money or other thing of value, directly or indirectly, to . . . any person engaged in operating, owning, or maintaining any on-sale premises where alcoholic beverages are sold for consumption on the premises."

[2] Rule 106(i)(2) provides in part: "Without violating this rule, suppliers may sponsor contests, races, tournaments, and other similar activities on or off licensed premises. Sponsorships shall be only in the form of monetary payments to bona fide amateur or professional organizations established for the encouragement and promotion of the activities involved."

For a number of years beginning in the early 1990's, Chevys was the title sponsor for running events called "Chevys Fresh Mex Runs" and water events called "Chevys Fresh Mex Bathtub Regattas." An event management and promotions company known as A Change of Pace (ACOP) conducted the events for Chevys. Schieffelin was a cosponsor of a number of the events, and it is Schieffelin's sponsorship of the events that gave rise to the Department proceedings against it. The management and sponsorship of the Chevys Fresh Mex Runs and the nature of the relationship among Chevys, ACOP, and Schieffelin lie at the heart of this case, and we therefore set out the relevant facts in some detail.

ACOP is a for-profit company owned by David Miramontes and Jennifer Miramontes. David Miramontes is ACOP's president, and Jennifer Miramontes (Miramontes) serves as ACOP's vice-president and secretary. The company has only two full-time employees. According to Miramontes' testimony, ACOP's principal business is putting on sporting events, usually involving running. However, ACOP does not limit itself to running events; it also manages grand openings, charity functions, and corporate parties. ACOP's business involves the promotion of running events, but it does not conduct training or educational activities for runners, such as running clinics and workshops, and it does not produce instructional materials on running.

ACOP first became involved in the Chevys Fresh Mex Runs in about 1993, when David Miramontes conceived the idea for the races and approached Chevys with the concept. Chevys and ACOP developed a close and rather informal relationship in the planning, promotion, and management of the events. Chevys orally agreed to pay ACOP $10,000 per event to be the primary or "title" sponsor of the events. Both Chevys and ACOP were lax about keeping documentation regarding the financial transactions between the two companies. For example, there were seven Chevys events in California in 1999 which would have obligated Chevys to pay ACOP a total of $70,000 in sponsorship fees. In the proceedings before the Department, the evidence showed only two $6,000 payments from Chevys to ACOP. ACOP's records of sponsorship payments for those races do not reflect payments by Chevys.

Witnesses from ACOP and Chevys sought to explain the informality by noting that Chevys would make in-kind contributions to ACOP in connection with the races by paying for certain expenses, such as design or printing costs or by providing food at the races. Miramontes testified that she believed ACOP would then bill Chevys for the amount of the sponsorship fee less the value of the in-kind contribution, but she acknowledged that ACOP did not keep balance sheets or accounting data for these expenses. Bruce MacDiarmid, Chevys' chief marketing officer, testified that Chevys did not keep accounting ledgers or balance sheets showing how event costs were

divided between ACOP and Chevys. According to MacDiarmid, ACOP and Chevys operated on the basis of an oral agreement that had no specific terms regarding the in-kind contributions. Chevys' in-kind contributions varied from year to year, and MacDiarmid stated that ACOP and Chevys "generally got together annually and squared things up, if you will." The Department investigator testified that after reviewing the documents produced in the investigation, "[i]t was convoluted on what was being paid for and who was paying for what."

ACOP and Chevys worked closely to promote the races. At the same time that Miramontes served as ACOP's vice-president and secretary, she also worked as an independent contractor for Chevys, first conducting promotions and, as of September 2001, serving as Chevys' regional sales manager. Although ACOP was paid to manage and promote the events, Chevys was also active in the promotion and planning of the races, and it approved the design of the entry forms, flyers, table tents, posters, and T-shirts promoting the events. The races themselves were held at or near Chevys restaurants, and participants could register for the races at various Chevys locations. Schieffelin first became involved in the Chevys Fresh Mex Runs in 1996 after being approached by ACOP. MacDiarmid testified that while the races were in the "ideation phase," ACOP asked Chevys for a list of potential sponsors. MacDiarmid was aware that Chevys could not solicit funds from alcoholic beverage suppliers. In response to ACOP's request, however, Chevys provided ACOP with a list of contacts who might serve as sponsors for the events. The list included alcoholic beverage suppliers, such as Schieffelin, who did business with Chevys. ACOP then contacted the people on the list. Ultimately, a majority of sponsors of the Chevys Fresh Mex Runs were alcoholic beverage suppliers, although there were a number of other sponsors, including Pepsi, the Avocado Board, and suppliers of ice and chicken.

Schieffelin sponsored Chevys Fresh Mex Runs from 1996 through 1999. The focus of ACOP's approach to Schieffelin was the potential marketing opportunity offered by the Chevys events. In its letter seeking Schieffelin's sponsorship for the 1999 Chevys Fresh Mex Runs, ACOP emphasized that the events would help create brand awareness, promote goodwill within the community, create product loyalty, and increase sales. ACOP's letter to Schieffelin asserted that the events were "the ideal marketing platform for reaching several lucrative markets . . . ." The letter invited Schieffelin "to continue to tap the sales and marketing power of the 1999 [Chevys Fresh Mex Runs] by becoming an Official Sponsor[.]" ACOP claimed that the events' popularity "creates the perfect hook for increasing consumer sales, incenting [sic] retailers and distributors, enhancing corporate image and showing community involvement. In short, a Chevys Fresh Mex Run Series sponsorship offers a platform to sell more Grand Marnier."

Under its contract with ACOP, Schieffelin agreed to pay $6,000 per event to become a sponsor.[3] The sponsorship fees were paid to ACOP, and Schieffelin paid no money directly to Chevys. In return for the fees, Schieffelin was promised that the Grand Marnier logo would be displayed on advertising materials connected with the Chevys Fresh Mex Runs. As the contract promised, the Grand Marnier logo appeared on T-shirts, promotional flyers and posters, racers' bibs, and various "point of sale" items.[4] Although the contract did not expressly require that the point of sale materials be displayed in Chevys restaurants, ACOP made an effort to place point of sale materials in the restaurants to gain publicity for the event sponsors. Miramontes testified that promotional items bearing the Grand Marnier logo were, in fact, placed in Chevys restaurants. Schieffelin's national account sales director, Nancy Rosolanka, confirmed this, stating that she had visited Chevys restaurants and had seen posters and race entry forms bearing the Grand Marnier logo displayed there. The promotional items were also distributed at locations other than Chevys, such as sporting goods stores and health clubs.

### PROCEDURAL BACKGROUND

On August 17, 2001, the Department filed a six-count accusation against Schieffelin alleging that its sponsorship payments to ACOP constituted violations of two provisions of the Alcoholic Beverage Control Act. First, the Department asserted that Schieffelin had violated section 25500, subdivision (a)(2), which provides in part: "No . . . wholesaler, or any officer, director, or agent of any such person shall: [¶] . . . [¶] (2) Furnish, give, or lend any money or other thing of value, directly or indirectly, to . . . any person engaged in operating, owning, or maintaining any on-sale premises where alcoholic beverages are sold for consumption on the premises." Counts 1, 3, and 5 charged Schieffelin with a violation of this provision, alleging that Schieffelin, through its sponsorship fees, "did, directly or indirectly, furnish, give or lend money or other thing of value . . . to Chevys, Inc."

Second, the Department charged Schieffelin with a violation of section 25503, subdivision (h). That provision reads in part: "No . . . wholesaler, or any officer, director, or agent of any such person, shall do any of the following: [¶] . . . [¶] (h) Pay money or give or furnish anything of value for the privilege of placing or painting a sign or advertisement, or window

---

[3] Schieffelin paid ACOP for sponsorship of a number of Chevys Fresh Mex Runs in 1998 and 1999. It paid $6,000 per event to sponsor the 1998 and 1999 Sacramento runs and the 1999 Pleasanton run. Schieffelin paid $3,000 to ACOP for a lower tier of sponsorship for a San Jose run.

[4] "Point of sale" items are materials that are displayed where the sponsor's product is sold, for example posters, brochures, hats, and "table tents," which are printed cardboard triangles or pyramids that are placed on a table.

display, on or in any premises selling alcoholic beverages at retail." Counts 2, 4, and 6 of the accusation charged that by paying sponsorship fees, Schieffelin paid "Chevys, Inc., or its agent, A Change of Pace, for the privilege of placing an alcoholic beverage advertisement on or in a premises selling alcoholic beverages at retail, to wit: the 'Grand Marnier Liqueur' logo on race entry application forms, in violation of Section 25503(h) of the California Business and Professions Code."

On June 18 and 19, 2002, an administrative law judge (ALJ) held hearings. In his proposed decision, the ALJ found that the Department failed to establish that Schieffelin's payments to ACOP "constituted direct or indirect furnishing or giving of money or other thing of value to Chevys," and therefore the Department had not shown a violation of section 25500, subdivision (a)(2). The ALJ did find, however, that Schieffelin had violated section 25503, subdivision (h) because it paid ACOP a sponsorship fee with the understanding that ACOP would place promotional material bearing the Grand Marnier logo in Chevys restaurants.

The Department did not adopt the ALJ's proposed decision. Instead, it found that Schieffelin had violated both sections 25500, subdivision (a)(2) and 25503, subdivision (h). Although it agreed that Schieffelin paid no money directly to Chevys, it found that Schieffelin "indirectly gave money to Chevys by paying an intermediary, ACOP, for the benefit of sponsorship of Chevys' events." The Department concluded that without sponsorship payments from Schieffelin and other alcoholic beverage suppliers, the Chevys Fresh Mex Runs either would not have taken place, or the cost to Chevys would have been substantially higher. The Department further found that ACOP was acting on Chevys' behalf in soliciting Schieffelin to pay money to advertise in conjunction with Chevys' contests, to promote and stage events, and to associate the Grand Marnier name and logo with Chevys. The Department concluded that Schieffelin had violated section 25500, subdivision (a)(2). It also held that Schieffelin had violated section 25503, subdivision (h), and it rejected the argument that there was no violation merely because Schieffelin had made no payment to a retailer. The Department held that liability under the statute does not depend on who receives the payment; all that is required is a payment for the privilege of placing advertising in a retailer's premises.

The Department also held that Rule 106(i)(2) did not permit Schieffelin's sponsorship payments. Rule 106(i)(2) provides in part: "Contests sponsored by suppliers. Without violating this rule, suppliers may sponsor contests, races, tournaments, and other similar activities on or off licensed premises. Sponsorships shall be only in the form of monetary payments to bona fide amateur or professional organizations established for the encouragement and promotion of the activities involved." The Department found that ACOP was

not a "bona fide amateur or professional organization" within the meaning of Rule 106(i)(2) because ACOP's aim was "promoting itself and the products and services of those who sponsor the events." The Department entered an order suspending Schieffelin's license for 15 days.

Schieffelin appealed to the Board. The Board reversed the Department's decision, finding that Schieffelin's sponsorship was permitted by Rule 106(i)(2). The Board accepted Schieffelin's argument that ACOP fell within the plain language of the rule because it was a bona fide professional organization established to encourage and promote races. The Board found that the Department's interpretation of its own rule was not entitled to deference, because it conflicted with the plain language of the rule. The Board acknowledged that the Department may well have intended to restrict qualifying organizations under the rule to nonprofits or to those that promote particular sports, but that it had simply failed to accomplish that objective when it drafted the rule. The Board reversed the Department's decision, and we then granted the Department's petition for writ of review.

Discussion

The Department challenges the Board's holding that Rule 106(i)(2) permits Schieffelin's sponsorship of the Chevys Fresh Mex Runs. It contends that ACOP is not a "bona fide amateur or professional organization established for the encouragement and promotion of the activities involved" and that the Board erred in holding otherwise. Schieffelin responds that the Board properly interpreted the Department's regulation. In addition, Schieffelin urges us to sustain the Board's decision on three other grounds. It argues first that Schieffelin made no direct or indirect payments to Chevys that would violate section 25500, subdivision (a)(2). Second, Schieffelin asserts that the Department's decision misinterprets section 25503, subdivision (h). Third, Schieffelin contends that there is no evidence that its conduct was contrary to public welfare or morals, and thus the suspension of its license was unwarranted. We address each of these issues in turn.

I. *Standard of Review*

The scope of our review is established by section 23090.2. We are limited to determining, "based on the whole record of the department as certified by the board, whether: [¶] (a) The department has proceeded without or in excess of its jurisdiction. [¶] (b) The department has proceeded in the manner required by law. [¶] (c) The decision of the department is supported by the findings. [¶] (d) The findings in the department's decision are supported by substantial evidence in the light of the whole record. [¶] (e) There is relevant evidence which, in the exercise of reasonable diligence, could not have been

produced or which was improperly excluded at the hearing before the department." The statute clearly directs our review to the Department's decision, not the Board's. (*Dept. of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2004) 118 Cal.App.4th 1429, 1437 [13 Cal.Rptr.3d 826] (*Masani*); *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1072 [123 Cal.Rptr.2d 278] (*Deleuze*).) The scope of our review under section 23090.2 "is a narrow one." (*Deleuze,* at p. 1071.)

■ In section 25750, subdivision (a), the Legislature has granted the Department broad authority to " 'make and prescribe those reasonable rules as may be necessary or proper to carry out the purposes and intent of Section 22 of Article XX of the California Constitution and to enable it to exercise the powers and perform the duties conferred upon it by that section or by this division, not inconsistent with any statute of this state . . . .' " (*Coors Brewing Co. v. Stroh* (2001) 86 Cal.App.4th 768, 773 [103 Cal.Rptr.2d 570] (*Coors Brewing Co.*), quoting § 25750, subd. (a).) Article XX, section 22 of the California Constitution grants the Department the authority to regulate the manufacture, importation, and sale of alcoholic beverages in accordance with laws enacted by the Legislature. (*Coors Brewing Co.,* at p. 773.) The Department is authorized to interpret its own rules (*Samson Market Co. v. Kirby* (1968) 261 Cal.App.2d 577, 584 [68 Cal.Rptr. 130]), and it is generally appropriate for courts to accept the Department's administrative expertise on this point (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (1999) 71 Cal.App.4th 1518, 1523 [84 Cal.Rptr.2d 621] (*Anheuser-Busch, Inc.*)).

We defer to the Department's interpretation of its own rules, " 'since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha Corp.*).) Courts generally will not depart from the Department's contemporaneous construction of a rule enforced by the Department unless such interpretation is clearly erroneous or unauthorized. (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2003) 109 Cal.App.4th 1687, 1696 [1 Cal.Rptr.3d 339] (*7-Eleven, Inc.*).)

■ Our review of the Department's factual findings and conclusions is circumscribed by section 23090.3, which provides that "[t]he findings and conclusions of the department on questions of fact are conclusive and final and are not subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the department." We accept the Department's findings of fact as conclusive. (*CMPB Friends, Inc. v. Alcoholic*

*Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1250, 1254 [122 Cal.Rptr.2d 914] (*CMPB Friends*).) We indulge "all legitimate inferences in support of the Department's determination." (*Masani, supra,* 118 Cal.App.4th at p. 1437.) A reviewing court may not disregard or overturn the Department's findings of fact merely because it concludes that contrary findings would be equally or more reasonable. (*Kirby v. Alcoholic Bev. etc. Appeals Bd.* (1972) 7 Cal.3d 433, 436 [102 Cal.Rptr. 857, 498 P.2d 1105].) In short, we may not exercise our independent judgment on the evidence. (*CMPB Friends,* at p. 1254.)

## II. *The Statutory Scheme*

■ Sections 25500 and 25503 are part of the tied-house restrictions (§§ 25500–25512) of the Alcoholic Beverage Control Act. We do not construe either of these two statutes or Rule 106 in a vacuum. Rather, we take into consideration the policies and purposes of the Alcoholic Beverage Control Act, recognizing that "the purpose sought to be achieved and evils to be eliminated have an important place in ascertaining the legislative intent." (*Reimel v. Alcoholic Bev. etc. App. Bd.* (1968) 263 Cal.App.2d 706, 711 [69 Cal.Rptr. 744].) We apply the same rules of construction to the Department rule and resolve disputes about the regulation's meaning "by reference to the legislative intent so that we can effectuate the purpose of the law." (*Acapulco Restaurants, Inc. v. Alcoholic Beverage Control Appeals Bd.* (1998) 67 Cal.App.4th 575, 580, fn. 5 [79 Cal.Rptr.2d 126] (*Acapulco Restaurants*).)

■ The goals of the Alcoholic Beverage Control Act are set forth in the act itself. The act is intended for the protection of "the safety, welfare, health, peace, and morals of the people of the State, to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic beverages." (§ 23001.) In section 23001, the Legislature declared that "the subject matter of this division involves in the highest degree the economic, social, and moral well-being and the safety of the State and of all its people. All provisions of this division shall be liberally construed for the accomplishment of these purposes." The courts have explained that " '[t]he "economic" welfare which will be achieved by strict regulation and curtailment of the use of liquor and the economic benefits resulting to the people from the promotion of temperance, rather than those resulting from the promotion of the liquor industry is the welfare which is meant by [this] section.' " (*Pronto Market No. 1, Inc. v. Alcoholic Bev. etc. Appeals Bd.* (1976) 61 Cal.App.3d 545, 555 [132 Cal.Rptr. 236].)

Tied-house statutes are so named because they were enacted to prevent the return of saloons operated by liquor manufacturers, a practice that had been common in the early 1900's. (*Actmedia, Inc. v. Stroh* (9th Cir. 1986) 830 F.2d 957, 959 (*Actmedia*).) The California Supreme Court has explained that the Legislature enacted the tied-house provisions after the repeal of the 18th Amendment to prevent two particular dangers that had been common before Prohibition. (*California Beer Wholesalers Assn., Inc. v. Alcoholic Bev. etc. Appeals Bd.* (1971) 5 Cal.3d 402, 407 [96 Cal.Rptr. 297, 487 P.2d 745] (*California Beer Wholesalers*).) First, the Legislature aimed to prevent "the ability and potentiality of large firms to dominate local markets through vertical and horizontal integration." (*Ibid.*) Second, the Legislature wanted to curb "the excessive sales of alcoholic beverages produced by the overly aggressive marketing techniques of larger alcoholic beverage concerns." (*Ibid.*) The Legislature established a triple-tiered distribution and licensing scheme for alcoholic beverages. (*Ibid.*) Manufacturers were to be separated from wholesalers, and wholesalers were to be separated from retailers. (*Ibid.*) "In short, business endeavors engaged in the production, handling, and final sale of alcoholic beverages were to be kept 'distinct and apart.' " (*Ibid.,* quoting 25 Ops.Cal.Atty.Gen. 288, 289 (1955).) The Legislature intended that firms operating at one level of distribution "were to remain free from involvement in, or influence over, any other level." (*California Beer Wholesalers, supra,* 5 Cal.3d at p. 408.)

The drafters of the tied-house provisions believed that if manufacturers and wholesalers were allowed to gain influence through economic means over retail establishments, they would then use that influence to obtain preferential treatment for their products and either the exclusion of or less favorable treatment for competing brands. (*Actmedia, supra,* 830 F.2d at p. 966.) Legislators were concerned that such practices would lead to an increase in alcohol consumption as retailers adopted aggressive marketing techniques to encourage customers to purchase the alcoholic beverages they stocked. (*Ibid.*; *California Beer Wholesalers, supra,* 5 Cal.3d at p. 407, fn. 7.)

### III. *The Department Properly Construed Rule 106(i)(2)*

Schieffelin argues that its sponsorship of the Chevys Fresh Mex Runs was permitted by Rule 106(i)(2) and that ACOP fell within the literal wording of the rule, which permits alcoholic beverage suppliers to sponsor "contests, races, tournaments, and other similar activities" so long as the sponsorships take the form of monetary payments to "bona fide amateur or professional organizations established for the encouragement and promotion of the activities

involved." (Rule 106(i)(2).) The Board accepted this argument, holding that ACOP met the rule's criteria because it "encouraged and promoted races."[5]

The Department argues that ACOP does not fall within the language of the rule because it was established to provide marketing services to companies like Chevys, not for the promotion of running or water activities. In the Department's view, qualifying organizations under Rule 106(i)(2) are those that are directly involved in developing and supporting a particular sport or activity. Under the Department's interpretation, the organizations included within Rule 106(i)(2) would generally be organizations interested in the promotion of an activity as an end in itself, rather than as a vehicle for commercial exploitation.

Schieffelin, on the other hand, contends that the rule "means what it says" and that the Department may not rewrite or ignore the plain language. We reject Schieffelin's argument, for it would have us interpret Rule 106(i)(2) without reference to the underlying statutory scheme and the purpose of the tied-house restrictions. (See *Acapulco Restaurants, supra,* 67 Cal.App.4th at p. 580, fn. 5.) Furthermore, we defer to the Department's interpretation of its rule, since the Department is likely to be intimately familiar with its own rule and sensitive to the practical implications that a particular interpretation may have for the tied-house provisions of the Alcoholic Beverage Control Act. (See *Yamaha Corp., supra,* 19 Cal.4th at p. 12.)

■ Section 25500, subdivision (a)(2) and section 25503, subdivision (h) prohibit indirect payments by suppliers to retailers and payments by suppliers for the privilege of placing advertisements in retail premises. No Department rule may alter or amend these statutory prohibitions. (*California Beer & Wine Wholesalers Assn. v. Department of Alcoholic Beverage Control* (1988) 201 Cal.App.3d 100, 106–107 [247 Cal.Rptr. 60].) Yet if organizations such as ACOP, which engages in the promotion and marketing of products, were considered qualifying organizations under Rule 106(i)(2), then the rule would permit suppliers like Schieffelin to subsidize marketing events for retailers and to pay for the privilege of placing advertising in retailers' premises in the

---

[5] We may take judicial notice of decisions of the Board. (*Reimel v. Alcoholic Bev. etc. Appeals Bd.* (1967) 254 Cal.App.2d 340, 346 [62 Cal.Rptr. 54].) We do so here to note that in this case the Board chose not to follow two of its own prior opinions in which it had sustained the Department's interpretation of Rule 106(i)(2) in appeals involving payments to ACOP by other sponsors of the Chevys Fresh Mex Runs. (See *Guinness UDV North America, Inc. v. Department of Alcoholic Beverage Control* (June 6, 2003) No. AB-7988, pp. 17–18 [http://www.abcappealsbd.ca.gov/decisions/pdf/AB_7900/7988.pdf]; *Labatt, USA, L.L.C. v. Department of Alcoholic Beverage Control* (June 6, 2003) No. AB-8002, pp. 14–15 [http://www.abcappealsbd.ca.gov/decisions/pdf/AB_8000/8002.pdf].) In those cases, the Board held that ACOP was not a qualifying organization within the meaning of the rule.

guise of sponsoring contests, races, or similar activities. The rule would permit what the statutes prohibit.

The facts of this case provide an apt illustration of the dangers inherent in the Board's literal interpretation of Rule 106(i)(2). ACOP is a for-profit entity that provides event management services, usually, but not exclusively, involving running. The Department concluded that the purpose of the Chevys Fresh Mex Runs was not the promotion of the "activities involved" (the races) but rather the marketing of the sponsors' products. ACOP's solicitation letter to Schieffelin was unambiguous on this point, describing the Chevys Fresh Mex Runs as "a platform to sell more Grand Marnier." ACOP, Chevys, and Schieffelin all focused their attention on the events as a means of promoting brand awareness, enhancing customer loyalty, and increasing sales. The promotion of either the sport of running or the Chevys events themselves was at best secondary to the primary goal of marketing. To hold that entities such as ACOP are qualifying organizations under Rule 106(i)(2) makes evasion of the tied-house restrictions a simple matter of employing an intermediary. "Surely the Legislature could not have intended to enact a licensing scheme so easily and ridiculously circumvented." (*California Beer Wholesalers, supra,* 5 Cal.3d at p. 412.)

■ The Department's regulations may not be "interpreted in a manner that results in absurd consequences or defeats the core purposes of their adoption." (*7-Eleven, Inc., supra,* 109 Cal.App.4th at p. 1696.) We decline to adopt Schieffelin's formalistic interpretation of Rule 106(i)(2), because the reading urged by Schieffelin would be inconsistent with the purposes of the tied-house restrictions. (See *Masani, supra,* 118 Cal.App.4th at pp. 1444–1445 [refusing literal interpretation of statute where such would lead to an unreasonable and illogical result].) The Department's interpretation is consistent with the Legislature's aim of keeping all tiers of the alcoholic beverage market distinct and apart. (*California Beer Wholesalers, supra,* 5 Cal.3d at p. 407.)

IV. *Substantial Evidence Supports the Finding That Schieffelin Violated Section 25500, Subdivision (a)(2)*

Schieffelin contends that the Department's conclusion that Schieffelin violated the prohibitions of section 25500, subdivision (a)(2) is not supported by substantial evidence. Again, in addressing this contention, we do not exercise our independent judgment on the evidence before the Department (§ 23090.2, subd. (e)); we indulge all legitimate inferences in support of the Department's determination. (*Masani, supra,* 118 Cal.App.4th at p. 1437.)

 The statute prohibits entities such as Schieffelin from furnishing, giving, or lending "any money or other thing of value, directly or indirectly" to any on-sale licensee. (§ 25500, subd. (a)(2).) Schieffelin correctly notes, and the Department agreed, that Schieffelin made no direct payments to Chevys. Schieffelin further argues that it made no *indirect* payments to Chevys. Schieffelin contends that there is "no evidence that ACOP applied Schieffelin's payments to pay Chevys or to reduce Chevys obligations, and, therefore, no evidence of an indirect payment to Chevys." We disagree.

Schieffelin indirectly furnished Chevys with a thing of value by providing a marketing-cost subsidy to Chevys for the Chevys Fresh Mex Runs. The evidence before the Department showed that Chevys had agreed to pay ACOP $10,000 per event to be the title sponsor of the Chevys Fresh Mex Runs. For the year 1999, this would have required Chevys to pay ACOP $70,000 for the seven Chevys events held in California that year.[6] Despite this agreement, the evidence showed that Chevys paid ACOP only $12,000 in sponsorship fees for that year and that Chevys covered roughly $21,000 in expenses for ACOP. Although Chevys did not make its promised sponsorship payments, the events went forward with Chevys as the title sponsor.

The Department concluded from this evidence that Chevys was not paying the full value of ACOP's marketing services and that sponsors such as Schieffelin were effectively subsidizing promotional events for Chevys. Without the other sponsors' payments, Chevys would have been forced either to make up the marketing cost shortfall or to eliminate the Chevys Fresh Mex Runs. Accordingly, the Department held that Schieffelin had indirectly furnished a thing of value to Chevys. This determination is supported by substantial evidence.

Relying on *Actmedia* and *Deleuze,* Schieffelin argues that courts have found indirect payments only when the supplier pays cash or cash equivalent to a retailer through a third party. Schieffelin reads *Actmedia* too broadly. That case arose out of a federal action challenging section 25503, subdivision (h) on both First Amendment and state law grounds. (*Actmedia, supra,* 830 F.2d at p. 958.) The plaintiff, Actmedia, leased advertising space on supermarket shopping carts and then subleased the space to the Adolph Coors Company, an alcoholic beverage producer. (*Id.* at pp. 958, 961.) The Department charged that this arrangement violated section 25503, subdivision (h), and Actmedia brought suit in federal court, alleging that the Department had either misconstrued the statute, or that if the Department's interpretation was correct, then the statute constituted an impermissible restriction on commercial speech. (830 F.2d at p. 958.) Significantly, the

---

[6] No documentary evidence was introduced regarding Chevys' payments for the 1998 events.

Ninth Circuit held that all of Actmedia's state law claims were barred by the Eleventh Amendment immunity of the United States Constitution. (*Id.* at pp. 963–964.) As a consequence, the Ninth Circuit did not address Actmedia's claims concerning the proper construction of section 25503, subdivision (h), and its opinion does not purport to render a definitive interpretation of the statute. Rather, the *Actmedia* court conducted only a First Amendment analysis of the statute's purposes and held that the application of this provision to Actmedia's activities did not ' violate the First Amendment. (830 F.2d at pp. 965–968.) While the facts of *Actmedia* involved an alcoholic beverage manufacturer that paid a third party advertising company that in turn made payments to retailers, (*id.* at pp. 958–959, 961), the Ninth Circuit did not hold that only payments to retailers are indirect payments in violation of section 25503, subdivision (h).

*Deleuze* supports the Department's position. In *Deleuze,* a winegrower (ZD Wines) was charged with violating section 25502, subdivision (a)(2), which is the counterpart to section 25500, subdivision (a)(2) applicable to off-sale retailers. ZD Wines had purchased advertising space in an off-sale retail licensee's catalogue from a printer whom the licensee had engaged to produce the catalogue. (*Deleuze, supra,* 100 Cal.App.4th at p. 1070.) The court rejected the argument that this was "only a straightforward purchase of advertising—a bilateral contract for which consideration was paid." (*Id.* at p. 1074.) It held that ZD Wines contributed a valuable and tangible benefit to the retailer "by participating in paying for the production of its exclusive sales catalog . . . ." (*Id.* at p. 1075.)

Similarly, Schieffelin has contributed something of value to Chevys by participating in paying for the Chevys Fresh Mex Runs. Schieffelin's sponsorship payments provided Chevys with the benefit of ACOP's marketing services and the promotional value of the races for which Chevys otherwise would have had to pay. The Department's decision is consistent with the legislative purpose informing the tied-house provisions. "An ongoing relationship between a [supplier] and a retailer such as that between [Schieffelin] and [Chevys] could easily lead to the kind of influence of a supplier over a retailer the statutes were intended to prevent," by causing Chevys to favor the products of suppliers who choose to sponsor Chevys' promotional events. (*Deleuze, supra,* 100 Cal.App.4th at p. 1075.) There is substantial evidence for the Department to conclude that the purpose of Schieffelin's sponsorship was to increase the likelihood that consumers would purchase more Grand Marnier from Chevys. Indeed, Schieffelin's national account sales director

testified that Schieffelin hoped that the point of sale promotional materials for which it paid would induce consumers to order more Grand Marnier from Chevys, as well as from other retailers.

Schieffelin complains that the Department is seeking to hold it responsible for transactions between ACOP and Chevys to which Schieffelin was not a party and of which Schieffelin had no knowledge. The Department did not hold Schieffelin responsible for the acts of ACOP and Chevys. The accusation charged, and the Department proved, that Schieffelin indirectly furnished something of value to Chevys by subsidizing the marketing costs of the Chevys Fresh Mex Runs. That Schieffelin made its payments through an intermediary is not dispositive. It is "the end result, rather than the method of its attainment, that the Legislature exorcised." (*California Beer Wholesalers, supra,* 5 Cal.3d at p. 409.)

The Department found that ACOP "was no more than an alter ego of Chevys for the purpose of the 1998 and 1999 Chevys Fresh Mex Runs" and that "ACOP was acting on Chevys' behalf in soliciting [Schieffelin], as a supplier of Grand Marnier[.]" This finding is supported by evidence of a lack of financial accounting between ACOP and Chevys, Chevys' direct involvement in the planning and promotion of the races, and Miramontes' dual role as vice-president of ACOP and independent contractor handling Chevys' promotions. Further, the Department found that Schieffelin's payments to ACOP were for the benefit of Chevys and that they helped promote and stage race events that "were significantly more associated with Chevys than they were with ACOP." Schieffelin cannot have been unaware that its payments would help underwrite the costs of events designed to promote Chevys, the title sponsor of the races.

V. *The Department Properly Interpreted Section 25503, Subdivision (h)*

Schieffelin next contends that the Department has misconstrued section 25503, subdivision (h). Schieffelin makes three arguments in support of this contention: (1) that the Department erred by interpreting the statute to prohibit all supplier payments, not just payments to a retailer, for advertising privileges on a retailer's premises; (2) that the Department erroneously interprets the statute to prohibit a payment even when the supplier is not granted a privilege to place advertisements in retail premises; and (3) that the Department's interpretation would nullify entire sections of the Alcoholic Beverage Control Act. We disagree on all points.

### A. Section 25503, Subdivision (h) Does Not Require That Payments Be Made to a Retailer

Schieffelin contends that section 25503, subdivision (h), as interpreted in *Actmedia,* prohibits only payments *to retailers* for the privilege of advertising on retail premises. Since Schieffelin paid ACOP, not Chevys, Schieffelin argues that, under *Actmedia,* it did not violate the statute. In *Actmedia,* the Ninth Circuit referred to advertising payments made to retailers because those were the facts before it. (*Actmedia, supra,* 830 F.2d at pp. 966, 967.) Other statements in *Actmedia* are consistent with a reading of section 25503, subdivision (h) that does not require that the prohibited payments be made only to a retailer. For example, the *Actmedia* court described the statute as a "blanket prohibition of paid advertising in retail establishments." (*Id.* at p. 967.) It also described the scope of the statute as prohibiting "only *paid* advertising *in retail stores*." (*Id.* at p. 968, italics in original.) The court referred to a proscription of "paid advertising" without necessarily linking the payment to the retailer.[7]

Moreover, the statute itself contains no such requirement. The statute makes it unlawful for a wholesaler such as Schieffelin to "[p]ay money or give or furnish anything of value for the privilege of placing or painting a sign or advertisement . . . on or in any premises selling alcoholic beverages at retail." (§ 25503, subd. (h).) As the Department noted, the statute simply prohibits payments for the privilege of placing advertising in retail establishments; it does not specify the recipient of the payment. This language is in contrast to other subdivisions of section 25503, which do prohibit payments to particular recipients. (§ 25503, subd. (f) [specifying payments to a retailer or retailers].)

Schieffelin complains that after the hearing below, the Department "abandoned its interpretation of Section 25503(h) consistent with *Actmedia*" (an interpretation which required proof of payment to a retailer) and improperly adopted a new interpretation of the law to fit the limited facts the Department had proved at the hearing. Insofar as we are able to discern, Schieffelin's contention is that the accusation charged it with making payments to Chevys or its agent, ACOP, a position consistent with Schieffelin's reading of

---

[7] In its discussion of *Actmedia,* the *Deleuze* court referred to section 25503, subdivision (h) as "prohibiting suppliers from purchasing on-premises advertising from retailers . . . ." (*Deleuze, supra,* 100 Cal.App.4th at p. 1079.) This statement must be viewed in the factual context of *Deleuze.* In dictum, *Deleuze* went on to describe the statute as "a flat prohibition precluding manufacturers from making any payments *to retailers* for advertising . . . ." (*Ibid.,* italics added.) The discussion occurred after the court had already stated that it would not address a conclusory argument based on *Actmedia* raised by ZD Wines, an argument the court "treated as waived." (*Id.* at p. 1078.) The *Deleuze* court nevertheless went on to point out flaws in the argument. (*Id.* at pp. 1078–1079.)

*Actmedia,* but then the Department jettisoned this theory of the case "after the evidence closed and it was clear that the Department could not prove an agency[.]" As discussed previously (*ante,* at pt. IV), there was substantial evidence supporting a finding that ACOP was Chevys' agent.[8]

### B. *Schieffelin Paid for the Privilege of Placing Advertising on Retail Premises*

Schieffelin argues that it did not violate section 25503, subdivision (h) because its sponsorship payments were not for the privilege of placing advertising on Chevys' premises. In Schieffelin's view, its contract with ACOP granted it no absolute right to have the promotional materials bearing the Grand Marnier logo placed at Chevys, and thus there can have been no violation of the statute. Although Schieffelin concedes both that it expected the materials to be placed at Chevys and that the materials were, in fact, placed there, it nevertheless argues that this is insufficient to constitute a violation of the statute.

Our review of the record compels us to a different conclusion. Schieffelin's contract with ACOP stated unequivocally that in return for its sponsorship payments, "Grand Marnier will receive the following publicity and advertising." Part of the promised publicity and advertising was that "[t]he Grand Marnier logo will be included on all point of sale[] material as official sponsor of the Chevys to CHEVYS FRESH MEX RUN." The contract makes it clear that Schieffelin paid to have the Grand Marnier logo placed on materials distributed at the point of sale, that is, locations in which alcoholic beverages were sold at retail, such as Chevys restaurants.

The evidence and testimony from witnesses from Schieffelin, ACOP, and Chevys bear this out. When questioned about the sponsorship agreement, Rosolanka, Schieffelin's national account sales director, testified that she expected that point of sale materials would be displayed where Grand Marnier was sold. There is no dispute that Chevys, the events' title sponsor, sold Grand Marnier liqueur and that promotional materials bearing the Grand Marnier logo were indeed placed in Chevys restaurants.

In accord with the sponsorship agreement, ACOP, with Chevys' assistance, placed promotional materials with the Grand Marnier logo in Chevys restaurants, and this was part of the publicity and advertising for which Schieffelin paid. Miramontes testified that ACOP placed posters and table tents bearing the Grand Marnier logo in Chevys restaurants. Chevys ensured that this

---

[8] If Schieffelin's argument on this point is intended to advance a due process claim, it fails because it is "without supporting argument or authority other than general abstract principles." (*Deleuze, supra,* 100 Cal.App.4th at p. 1078.)

placement occurred. Isaac Gerstenzang, Chevys' marketing manager, directed the graphic design company that produced the point of sale materials to include the names of the event sponsors on the materials and stated that the names of the sponsors were "mandatory items for the back of the T-shirt." He further testified that all of these materials were displayed in Chevys restaurants and that he visited various Chevys locations with ACOP to ensure their proper placement.

We note also that the 1998 and 1999 Chevys Fresh Mex Runs were not the first Chevys events that Schieffelin had sponsored. Schieffelin had been involved in the race events since 1996. As the Department found, Schieffelin knew from its prior experience that the promotional materials "had been, and would continue to be, displayed in Chevys restaurants and would bear the Grand Marnier logo." Schieffelin therefore "understood and expected, from the use of the phrase 'point of sale' in the contract coupled with the presence of promotional materials in the restaurant in prior years, that ACOP would place . . . the Grand Marnier logo in Chevys premises in 1998 and 1999." Based on this experience, Schieffelin knew that it was paying to have its product's logo placed in Chevys' restaurants.

Schieffelin makes much of the fact that the promotional materials appeared in places other than Chevys restaurants. Although this is true, it does nothing to undermine the Department's decision. The other venues in which the promotional materials were displayed (such as health clubs, sporting good stores, juice bars, video stores, and coffee shops) do not sell alcoholic beverages. Any promotional items displayed in such places would not constitute the promised point of sale material referred to in the sponsorship agreement. This evidence demonstrates that Schieffelin did not pay ACOP "regardless of where the race materials were placed." Rather, Schieffelin paid for, and received, distribution of the promotional materials at the point of sale of its product, and it is undisputed that this included Chevys restaurants.

Schieffelin's claim that it had no right to have the promotional materials placed in Chevys restaurants simply misses the mark. Schieffelin clearly paid for a contractual right to have the promotional materials bearing its product's logo placed at the point of sale of its product, and such points of sale would necessarily be establishments that sold alcoholic beverages. Chevys restaurants, where at least some of the materials were placed, were one such point of sale. There is substantial evidence for the Department's conclusion that Schieffelin's sponsorship payments were made "for the privilege of placing . . . a sign or advertisement . . . in any premises selling alcoholic beverages at retail" and that the Department proved a violation of section 25503, subdivision (h).

### C. *The Department's Interpretation Does Not Nullify Other Sections of the Alcoholic Beverage Control Act*

Schieffelin next contends that the Department's interpretation of section 25503, subdivision (h) "would effectively ban all supplier advertising on retail premises and repeal all the laws that permit such advertising." According to Schieffelin, the Department's interpretation would prohibit suppliers from paying another person to produce advertising materials specifically permitted by law. (See, e.g., § 25611.1, subd. (a) [permitting wholesalers to provide signs for interior use in premises selling alcoholic beverages at retail].) The Department's interpretation, Schieffelin argues, would lead to the illogical or absurd situation in which "all advertising materials specifically permitted by law would be illegal when a supplier pays to have them produced or distributed with the 'expectation' they will be placed on a retail premises."

Our conclusion is not so far-reaching. Whether a supplier violates section 25503, subdivision (h) merely by paying another person to produce advertising materials if the supplier simply expects that the materials will be placed on retail premises is not the issue in this case. As discussed previously, Schieffelin did not pay for a mere expectation that the Grand Marnier logo would be displayed at Chevys restaurants. Based on the evidence, the Department could properly find that Schieffelin paid ACOP for the privilege of having promotional materials placed in Chevys premises. Schieffelin's argument is based on a factual scenario not present here, for it assumes a situation in which a supplier has paid for advertising materials but not for the privilege of having them placed on premises selling alcoholic beverages at retail.

As a consequence, neither the Department nor this court is faced with answering the question that Schieffelin poses. The Department did not hold, and neither do we, that suppliers such as Schieffelin violate section 25503, subdivision (h) simply by paying for advertising materials. The violation of the statute occurred when Schieffelin paid ACOP for the contractual right to have promotional materials bearing the Grand Marnier logo placed at the point of sale, Chevys restaurants. This interpretation does not nullify any other section of the Alcoholic Beverage Control Act.

### VI. *The Department Acted Within its Discretion in Suspending Schieffelin's License*

Schieffelin's final argument is that the Department could not properly suspend Schieffelin's license based solely on a finding that Schieffelin had violated the tied-house provisions. Schieffelin argues that the Department did

not prove that Schieffelin's sponsorship payments resulted in any of the evils that the tied-house laws were intended to prevent; therefore, there is no substantial evidence to support the suspension.

To the extent that Schieffelin argues that the Department failed to make a specific finding that its conduct was injurious to public welfare or morals, we note that both the California Supreme Court and this court have held that a finding that a licensee has violated provisions of the Alcoholic Beverage Control Act is tantamount to a finding of injury to public welfare and morals. (*Martin v. Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 287, 291 [341 P.2d 296]; *Mercurio v. Dept. Alcoholic etc. Control* (1956) 144 Cal.App.2d 626, 631 [301 P.2d 474] (*Mercurio*) [same].) In *Mercurio*, this court held that a finding that licensees had violated a Department rule was in effect a finding that the licensees' acts were contrary to public welfare and morals because the rule itself was an articulation of acts which the Department found to be contrary to public welfare and morals. (*Mercurio, supra,* 144 Cal.App.2d at p. 631.)

Similarly, the Legislature has already determined that the Alcoholic Beverage Control Act is intended "for the protection of the safety, *welfare,* health, peace, and *morals* of the people of the State" and that the act involves "in the highest degree" the "moral well-being" of the state and its people. (§ 23001, italics added.) The tied-house restrictions are part of this legislative design and are intended to promote public welfare and morals by preventing disorderly marketing conditions and fostering temperance. (*California Beer Wholesalers, supra,* 5 Cal.3d at p. 407.) The Department's determination that Schieffelin violated the tied-house statutes is a finding that its acts were contrary to public welfare and morals. (*Mercurio, supra,* 144 Cal.App.2d at p. 631.)

Furthermore, we cannot agree with Schieffelin's contention that its sponsorship payments "had no effect on Chevys sales, marketing or advertising of alcoholic beverages." As discussed earlier, Schieffelin's sponsorship payments did indeed have such an effect. Because Schieffelin sponsored the Chevys Fresh Mex Runs, Chevys distributed additional advertising materials for Grand Marnier liqueur in its restaurants. The Department could reasonably conclude that the sponsorship payments had an effect on Chevys marketing or advertising of alcoholic beverages.

We conclude that the Department's determination that Schieffelin's violation of the tied-house provisions warranted suspension of its license is supported by substantial evidence.

### Disposition

The decision of the Board is annulled. The decision of the Department is reinstated and the case is remanded to the Board for further proceedings consistent with this opinion.

Jones, P. J., and Simons, J., concurred.

On May 16, 2005, the opinion was modified to read as printed above.